UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN
GREEN BAY DIVISION

Kimberly-Clark Worldwide, Inc., and
Kimberly-Clark Global Sales, LLC,

                Plaintiffs,                      Case No. 14-C-1466

v.                                         Judge William C. Griesbach

First Quality Baby Products, LLC and
First Quality Retail Services, LLC, and
First Quality Consumer Products, LLC.

                Defendants.

First Quality Baby Products, LLC and
First Quality Consumer Products, LLC,

                Counterclaim-Plaintiff,

                                  **JURY TRIAL DEMANDED**

v.

Kimberly-Clark Corporation,
Kimberly-Clark Worldwide, Inc., and
Kimberly-Clark Global Sales, LLC,

                Counterclaim-Defendants.

**DECLARATION OF JOHN BLEVINS IN SUPPORT OF FIRST QUALITY'S MOTION
FOR SUMMARY JUDGMENT THAT THE ASSERTED CLAIMS OF
U.S. PATENT NO. 8,747,379 ARE INVALID**

# TABLE OF CONTENTS

I. SUMMARY OF MY REPORT AND OPINIONS ........................................................- 1 -

II. BACKGROUND INFORMATION ..........................................................................- 2 -

    A. Summary of My Professional Background and Qualification ...........................- 2 -

    B. Legal Standards.................................................................................................- 2 -

III. THE '379 PATENT ..............................................................................................- 4 -

    A. Summary of the Background of the '379 Patent...............................................- 4 -

    B. Summary of the Alleged Invention of the '379 Patent .....................................- 5 -

    C. The Prosecution History of the '379 Patent.....................................................- 6 -

    D. The Asserted Claims of the '379 Patent ..........................................................- 7 -

IV. CLAIM CONSTRUCTION....................................................................................- 8 -

V. ONE OF ORDINARY SKILL IN THE ART ...........................................................- 8 -

VI. THE ASSERTED CLAIMS OF THE '379 PATENT ARE INVALID ........................- 9 -

    A. Summary of the 1996 Pull-Ups Training Pant.................................................- 9 -

    B. Summary of the LaFleur Patent .....................................................................- 15 -

    C. The Asserted Claims Are Obvious Over The Prior Art...................................- 16 -

        1. Claim 1 Is Obvious Over the 1996 Pull-Ups in View of LaFleur ........- 17 -

        2. Claim 2 Is Obvious Over the 1996 Pull-Ups In View of LaFleur ........- 19 -

        3. Claim 3 Is Obvious Over: (a) the 1996 Pull-Ups and LaFleur and (b) the 1996 Pull-Ups and LaFleur in View of Surprise......................- 20 -

        4. Claim 4 Is Obvious Over: (a) the 1996 Pull-Ups and LaFleur and (b) the 1996 Pull-Ups and LaFleur in View of Surprise......................- 23 -

        5. Claim 5 Is Obvious Over: (a) the 1996 Pull-Ups and LaFleur and (b) the 1996 Pull-Ups and LaFleur in View of Surprise and Long.......- 25 -

        6. Claim 6 Is Obvious Over the 1996 Pull-Ups and LaFleur in View of Surprise...........................................................................................- 27 -

        7. Claim 7 Is Obvious Over: (a) the 1996 Pull-Ups and LaFleur and (b) the 1996 Pull-Ups and LaFleur in View of Long...........................- 28 -

        8. Claim 8 Is Obvious Over: (a) the 1996 Pull-Ups and LaFleur and (b) the 1996 Pull-Ups and LaFleur in View of Long...........................- 28 -

        9. Claim 10 Is Obvious Over the 1996 Pull-Ups and LaFleur..................- 30 -

        10. Claim 11 Is Obvious Over the 1996 Pull-Ups and LaFleur..................- 31 -

        11. Claim 12 Is Obvious Over the 1996 Pull-Ups and LaFleur..................- 33 -

        12. Claim 13 Is Obvious Over the 1996 Pull-Ups and LaFleur in View of Brandon ..........................................................................................- 34 -

| | | |
|---|---|---|
| 13. | Claim 14 Is Obvious Over the 1996 Pull-Ups and LaFleur in View of Kuen | - 38 - |
| 14. | Claim 15 Is Obvious Over the 1996 Pull-Ups and LaFleur | - 40 - |
| 15. | Claim 16 Is Obvious Over the 1996 Pull-Ups and LaFleur | - 41 - |
| 16. | Claim 18 Is Obvious Over: (a) the 1996 Pull-Ups and LaFleur in View of Van Gompel and (b) the 1996 Pull-Ups and LaFleur in View of Long | - 45 - |
| 17. | Claim 23 Is Obvious Over the 1996 Pull-Ups and LaFleur | - 47 - |
| 18. | Claim 24 Is Obvious Over: (a) the 1996 Pull-Ups and LaFleur and (b) the 1996 Pull-Ups and LaFleur in View of Long | - 48 - |
| 19. | Claim 25 Is Obvious Over the 1996 Pull-Ups and LaFleur in View of Additional References | - 49 - |
| 20. | Claim 27 Is Obvious Over the 1996 Pull-Ups and LaFleur in View of Additional References | - 50 - |
| 21. | Claim 28 Are Obvious Over the 1996 Pull-Ups and LaFleur in View of Additional References | - 51 - |
| 22. | Claim 29 Is Obvious Over the 1996 Pull-Ups and LaFleur in View of Additional References | - 51 - |
| VII. | SECONDARY CONSIDERATIONS OF NONOBVIOUSNESS | - 52 - |
| VIII. | CONCLUDING REMARKS | - 52 - |

Case 1:14-cv-01466-WCG   Filed 01/23/15   Page 3 of 55   Document 94

I, John Blevins, declare as follows:

1.       I make this declaration in support of Defendants First Quality Baby Products, LLC, First Quality Retail Services, LLC and First Quality Consumer Products, LLC's (collectively, "First Quality") Motion for Summary Judgment That the Asserted Claims of U.S. Patent No. 8,747,379 ("the '379 Patent") Are Invalid.

2.       I have reviewed the '379 Patent and the history of the prosecution of the '379 Patent in the United States Patent and Trademark Office ("Patent Office"), as well as the documents and information referred to herein.  Attached hereto as Exhibit 1 is a list of the materials that I have relied upon in reaching my opinions set forth herein.  A copy of the '379 Patent is attached as Exhibit 2.

I.       <u>SUMMARY OF MY REPORT AND OPINIONS</u>

3.       As explained in this Declaration, it is my opinion that Claims 1-8, 10-16, 18, 23-25, and 27-29 of the '379 Patent (collectively, the "Asserted Claims") are invalid as obvious based upon the prior art discussed herein.

4.       I understand that a parent of the '379 Patent, U.S. Patent No. 6,849,067 ("the '067 Patent") was the subject of a prior litigation between the parties, *Kimberly-Clark Worldwide, Inc. et al. v. First Quality Baby Products, LLC et al.*, Case No. 09-C-916 (E.D. Wis.) ("the Prior Litigation").  I also understand that, as a result of the Prior Litigation, Claims 8-10 of the '067 Patent were held invalid as obvious over some of the prior art discussed below, including an early Kimberly-Clark ("K-C") Pull-Ups training pant and U.S. Patent No. 4,610,680 to LaFleur ("LaFleur").  I have been informed that the District Court's judgment regarding the '067 Patent was affirmed by the Court of Appeals of the Federal Circuit and is now final.

5.       The Asserted Claims are very similar to the invalidated claims of the '067 Patent. Specifically, the Asserted Claims are directed to training pants having refastenable seams that

cover about 80 to 100 percent of the distance between the waist opening and leg openings; similarly, invalidated Claim 8 of the '067 Patent required the refastenable seams to extend from the waist opening to each leg opening (i.e., about 100%). As discussed below, LaFleur teaches a refastenable seam that covers 100% of the distance between the waist and leg openings, and it would have been obvious to replace the bond seams in K-C's non-refastenable Pull-Ups with the refastenable seam of LaFleur. This is consistent with the District Court's invalidity findings for the '067 Patent.

6.     The Asserted Claims of the '379 Patent also add design features (e.g., the use of elastics, graphics, dimensions, etc.) which were included in K-C's non-refastenable Pull-Ups, as well as other prior art discussed herein. As discussed below, the inclusion of these additional design features was also obvious over the prior art.

II.     BACKGROUND INFORMATION

A.     Summary of My Professional Background and Qualification

7.     My professional background, qualifications, and experience testifying as an expert are set forth in my *curriculum vitae,* attached as Exhibit 3.

B.     Legal Standards

8.     To perform my invalidity analysis, I have been informed about the legal standards for patent invalidity.

9.     Specifically, I understand that a patent is presumed valid, but that it may be invalidated by one or more references, either alone or in combination, as being obvious. Further, I understand that invalidity of a patent claim must be established by "clear and convincing evidence."

10.     I further understand that a patent claim may be "obvious" if one or more items of prior art from the relevant field(s), either alone or in combination, contain(s) all of the elements

of a claim. My understandings of the requirements under the obviousness analysis are discussed below.

11.     It is my understanding that in considering the issue of obviousness, I should consider what a person of ordinary skill in the pertinent art would have known at the time of the invention, as well as what such a person would have reasonably expected to have been able to do in view of that knowledge.

12.     I understand that in analyzing the issue of obviousness, I should consider and determine: (1) the scope and content of the prior art; (2) the differences between the prior art and the claims at issue; and (3) the level of ordinary skill in the pertinent art.

13.     I further understand that any of the following may provide a reason for combining elements known in the prior art:

(a) a need or problem known in the field at the time of invention and addressed by the patent;

(b) a design need or market pressure to solve a problem;

(c) a simple substitution of one known element for another that would provide predictable results;

(d) the use of known techniques to improve similar methods or products in the same way; or

(e) some teaching, suggestion, or motivation in the prior art that would have led one of ordinary skill to modify the prior art reference or to combine prior art reference teachings to arrive at the claimed invention.

14.     I also understand that claims may be invalid if they are directed to obvious design choices. Specifically, I understand that a patent claim that simply arranges old elements with each performing the same function it had been known to perform is not patentable. The

594417.8                                               3

combination of familiar elements according to known methods is likely to be obvious when it does no more than yield predictable results.

15. I also understand that certain "secondary considerations" of non-obviousness may be considered, to the extent that they exist. It is my understanding that such secondary considerations include: (a) commercial success; (b) long felt but unsolved needs; (c) failure of others; (d) industry skepticism; (e) praise by others; and (f) copying. I understand that there must be some connection between the secondary considerations and the claimed invention.

16. I have also been informed that a party may be precluded from relitigating a fact or issue decided in a prior lawsuit, where the party has had a full and fair opportunity to litigate the fact or issue.

## III. THE '379 PATENT

17. The following summarizes the disclosure, prosecution history, and Asserted Claims of the '379 Patent.

### A. Summary of the Background of the '379 Patent

18. The '379 Patent is entitled "Absorbent Articles with Refastenable Side Seams" and issued on June 10, 2014 from U.S. Patent Application No. 12/692,103 ("the '103 Application"), filed January 22, 2010. (Ex. 2, '379 Patent, Cover).

19. The '103 Application is a continuation of U.S. Patent Application No. 11/033,201, filed January 11, 2005 (now U.S. Patent No. 7,695,464), which is a continuation of U.S. Patent Application No. 10/676,442, filed September 30, 2003 (now the '067 Patent), which is a continuation of U.S. Patent Application No. 09/444,083, filed November 22, 1999 (now U.S. Patent No. 6,761,711), which claims priority from U.S. Provisional Application No. 60/112,707 filed December 18, 1998. (*Id.*).

B.    Summary of the Alleged Invention of the '379 Patent

20.    The '379 Patent relates to a child's training pant with refastenable seams (e.g., seams connected by "hook" and "loop" fasteners, such as Velcro).  (Ex. 2, '379 Patent, Cols. 1:65-2:8 and Cols. 4:60-5:10).  The '379 Patent recognized that training pants known in the prior art had bonded seams between elastic side panels.  (*Id.* at Col. 1:26-31).  The '379 Patent states that it was desirable to have a pant that could "be removed quickly and easily . . . [especially] when the pant contains messy excrement" (i.e., when the pant was soiled).  (*Id.* at Col. 5:41-45).

21.    To address this soilage "problem," the '379 Patent discloses the use of refastenable seams.  (*Id.* at Col. 1:65-67 and Fig. 1).  Specifically, as shown in annotated Figure 1 below, the '379 Patent discloses the use of hook and loop fasteners 82-85 to form refastenable seams 88 on the side panels 34, 134, instead of bonded seams.  (*Id.* at Col. 2:37-39, 58-62 and Cols. 16:63-17:27).



FIG. 1

22.      The '379 Patent states that the refastenable seams allow for easier removal of "the training pant from the waist of the wearer with reduced risk of undesirably soiling the clothes or legs of the wearer."  (*Id.* at Col. 2:41-45).  The refastenable seams can also be "easily disengaged . . . to inspect the training pant for possible soiling."  (*Id.* at Col. 2:45-48).

23.      The '379 Patent also discusses known training pant features, including elastic side panels, waist elastics, leg elastics, printed graphics, "containment flaps" around the leg openings that help to contain excrement, and absorbent assembly that absorbs urine, and a surge layer that transports the urine to the absorbent assembly.  (*Id.* at Cols. 14:50-15:3, Col. 10:9-13, Col. 10:4-8 and Col. 13:23-35).  The specification admits that many of these features (e.g., graphics, containment flaps) were old.  (*See, e.g.*, *id.* at Cols. 9:56-10:8 and Col. 11:47-53).

C.      The Prosecution History of the '379 Patent

24.      During the prosecution of the '103 Application, the Examiner did not discuss or otherwise apply the most pertinent prior art, which I discuss below.  Nor does it appear that the Examiner relied upon any of the prior art or invalidity findings from the Prior Litigation.

25.      On November 6, 2012, K-C filed a Request for Continued Examination of the '103 Application, along with an Information Disclosure Statement ("IDS") that listed over 100 documents, including the District Court's September 29, 2012 summary judgment decision.  (Ex. 4, '103 App., Nov. 6, 2012 IDS).  Aside from including the District Court's decision on this long list, K-C never discussed this decision or the prior art that was used to invalidate the asserted claims of the '067 Patent.

26.      In the subsequent Office Action issued on June 12, 2013, the Examiner did not mention the prior art relied upon by the District Court, or even reference the District Court's summary judgment decision.  Instead, the Examiner rejected the pending claims as obvious over other less pertinent prior art.  (Ex. 5, June 12, 2013 Office Action at 3-7).  In response, K-C

argued that the Examiner failed to establish a *prima facie* case of obviousness because her rejections did not articulate how the cited prior art disclosed certain claimed features, including the refastenable seams that the District Court found were taught in the prior art. (Ex. 6, Sept. 10, 2013 Response at 2-11).

27.     Thereafter, the Examiner issued a Notice of Allowance for the '103 Application. (Ex. 7, Jan. 28, 2014 Notice of Allowance). No reasons were provided for the allowance of the claims and the '379 Patent issued on June 10, 2014.

28.     I understand that the Patent Office is currently reconsidering the validity of the '379 Patent in *inter partes* review ("IPR") proceedings. Specifically, First Quality filed petitions on June 23, 2014 for IPR of all of the claims of the '379 Patent. On October 7, 2014, K-C submitted preliminary responses, urging the Patent Office to deny the petitions. (Ex. 8, IPR2014-01021, Oct. 7, 2014 Response; Ex. 9, IPR2014-01024, Oct. 7, 2014 Response). On December 15, 2014, the Patent Office granted First Quality's petitions and instituted IPRs, finding that there is a "reasonable likelihood" that all of the claims are unpatentable as obvious. (Ex. 10, IPR2014-01021, Dec. 15, 2014 Order, Paper No. 9 at 10; Ex. 11, IPR2014-01024, Dec. 15, 2014 Order, Paper No. 9 at 10).

      D.    The Asserted Claims of the '379 Patent

29.     It is my understanding that K-C alleges that First Quality's training pants infringe Claims 1-8, 10-16, 18, 23-25, and 27-29 of the '379 Patent. These Asserted Claims are directed to training pants having refastenable seams that cover about 80 to 100 percent of the distance between the waist opening and leg openings. The Asserted Claims of the '379 Patent also add design features (e.g., the use of elastics, graphics, dimensions of components, integral loop fasteners, etc.). As discussed below, all these features were old or merely design choices that would have been obvious to one of ordinary skill in the art.

IV. **CLAIM CONSTRUCTION**

30.     In forming my opinions, I have considered the customary and ordinary meaning of the terms of the Asserted Claims, as well as the specific definitions set forth by the patentees in the specification of the '379 Patent. (Ex. 2, '379 Patent, Cols. 5:61-8:14).

31.     I have also considered the claim constructions proposed by the parties, which are shown in the chart below:

| Term (Claims) | K-C's Proposed Construction | First Quality's Proposed Construction |
|---|---|---|
| "generally parallel" (all) | at an angle within about 35 degrees or less of the referenced axis | at an angle within about 35 degrees or less |
| "side panels" (all) | "side panels that have been bonded to the composite structure" | ordinary and customary meaning |
| "wherein the training pant is prefastened to provide a pant-like product for the user" (16, 25) | wherein the fastening components and mating fastening components of the side panels of the training pant are fastened or otherwise connected during manufacture and prior to sale such that the user is provided with a pant-like product | wherein the side panels of the training pant are fastened or connected during manufacture and prior to sale such that the user is provided with a pant-like product |

32.     As discussed below, it is my opinion that, even under K-C's proposed constructions, the Asserted Claims are invalid as obvious.

V. **ONE OF ORDINARY SKILL IN THE ART**

33.     I understand that the District Court determined that, with respect to the closely related '067 Patent, a person of ordinary skill in the art "is a person with two-to-four years of work experience in product design and testing of disposable absorbent articles such as diapers, training pants, and incontinence briefs." (Ex. 12, *Kimberly-Clark Worldwide, Inc. v. First Quality Baby Products*, 900 F. Supp. 2d 903, 909 (E.D. Wis. 2012)).

34.     I agree with and adopt this definition for purposes of my analysis of the '379 Patent.

## VI.     THE ASSERTED CLAIMS OF THE '379 PATENT ARE INVALID

35.     It is my opinion that K-C's prior art sealed side-seam Pull-Ups in combination with the refastenable seams of LaFleur discloses all of the limitations of Claim 1. The additional elements recited in the other Asserted Claims (e.g., graphics, containment flaps, a surge layer, etc.) would have been obvious to one of ordinary skill in the art in view of this same prior art, and the additional references discussed below.

### A.     Summary of the 1996 Pull-Ups Training Pant

36.     I understand that K-C introduced its original, permanently sealed Pull-Ups disposable training pants to the market in 1989. I also understand that, in finding the '067 Patent invalid, the District Court relied upon an early version of K-C's Pull-Ups ("the 1989 Pull-Ups"), which is shown in the photograph below:



37.     I also understand that the 1989 Pull-Ups were a commercial embodiment of the

training pant disclosed in U.S. 4,940,464 to Van Gompel ("Van Gompel," Ex. 13), which

discloses a training pant with bonded seams.  (*See* Ex. 12, *Kimberly-Clark Worldwide, Inc.*, 900

F. Supp. 2d at 906).

38.     I have been provided by counsel with the permanently sealed training pant shown

in the photograph below.  I understand that this is a later version of K-C's original Pull-Ups

training pant, sold in the United States in October 1996 ("the 1996 Pull-Ups").  I understand that

the particular sample that I was provided is a size 3 boys pant.  I also note that the packaging of

this pant is marked with several K-C patents, including Van Gompel.

 

**Front**                                                        **Back**

39.     The following description is based on my inspection of these training pants, as

well as my own experience in the field.

40.     As shown in the photograph below, the 1996 Pull-Ups is a disposable training

pant having a front waist region, a back waist region, and crotch region interconnecting the front

and back panels.  They have a pair of non-woven, elastomeric front side panels, and a pair of

non-woven, elastomeric back side panels that are permanently bonded together to form a

disposable absorbent article with a waist opening and a pair of leg openings.



41.     I confirmed that the side panels of the 1996 Pull-Ups are elastomeric, as defined in the '379 Patent,[1] by measuring the relaxed length of the side panels, stretching the side panels beyond their relaxed length, and measuring the length of the elongated side panels. I then released the side panels, and observed that they retracted to approximately their original relaxed length. I noted that each side panel could be elongated by approximately 100% of its relaxed length, i.e., from about 2 inches to about 4 inches.

42.     Using the same procedure, I confirmed that the waist bands and leg members of the 1996 Pull-Ups are elasticized, that is, they recover to approximately their original size after

---

[1] The '379 Patent defines "elastomeric" as "a material or composite which can be elongated by at least 25 percent of its relaxed length and which will recover, upon release of the applied force, at least 10 percent of its elongation. It is generally preferred that the elastomeric material or composite be capable of being elongated by at least 100 percent, more preferably by at least 300 percent, of its relaxed length and recover, upon release of an applied force, at least 50 percent of its elongation." (Ex. 2, '379 Patent, Col. 6:20-27).

the removal of an applied force.

43.     I also confirmed that the side panels contain non-woven material by observing and handling the side panels.  Specifically, I cut a strip of material from the front side panel.  I extended this strip until it failed (i.e., broke apart), then looked at it with a magnifying glass.  I could clearly see the stretch film covered by the nonwoven on both sides of the sample.  As shown in the photograph below, the fibers were not woven (i.e., continuous), but rather randomly formed nonwoven fiber typical of the art.  In addition, the physical characteristics of the fibers, in terms of size and feel, were consistent with my experience working with nonwoven materials.



44.     The outer (or visible) portion of the pant includes printed graphics, including simulated elastic waistbands (front and back), simulated elastic leg bands and a "registered graphic" (i.e., scene with animals driving cars).  A registered graphic is a complete graphic, pattern or other feature that is always placed in a particular location on the pant (i.e., not positioned randomly).  As shown below, the cartoon-like scene is precisely positioned in the center of pant.  Similarly, the simulated elastic waistbands and simulated elastic leg bands are also precisely positioned on the pant.  I did not observe any graphics that were misplaced or cutoff.  All of this is consistent with a registered manufacturing process.  By comparison, the

graphics on the 1989 Pull-Ups were positioned randomly.



45.    In order to further study the pants, I tore the side seams and laid the article flat, as shown in the annotated figure below.  I first noted a pair of elasticized "containment flaps" extending the length of the pant.



46.     The outer cover of the pant is a composite material formed of a soft and flexible polyethylene ("PE") film (on the interior side) and a nonwoven material (on the exterior side). The outer cover is liquid impermeable, due to the PE film.  In this regard, I poured water into the area between the core and waist band, placed a weight on top of it, and confirmed that no water passed through the film.  The pant includes a topsheet (or bodyside liner) that is nonwoven and is liquid pervious.  Specifically, I poured water into the crotch area and observed the water immediately penetrate the topsheet, without pooling, and pass into the core.  After approximately one minute, I noted that the topsheet was slightly wet to the touch.  After approximately ten minutes, the topsheet was dry to the touch, as the core had fully absorbed the water.

47.     Finally, I cut open the topsheet to reveal the absorbent core, which was wrapped in tissue.  I observed a rectangular core that includes layers of fluff pulp fibers disposed between

the bodyside liner and the outer cover. Based upon my experience and observations (above), the fluff pulp fibers appear hydrophilic.



B.    <u>Summary of the LaFleur Patent</u>

48.    LaFleur issued on September 9, 1986, more than 13 years before K-C filed the '379 Patent. (Ex. 14, LaFleur, Cover). Like the '379 Patent, LaFleur describes the soilage problems associated with non-refastenable training pants. LaFleur explains how removing a permanently-sealed training pant from a child requires manipulating the child's body through the waist and leg openings of the pant, (*id.* at Col. 1:30-37 and Col. 2:10-17), and that this is especially disadvantageous because "once a garment has become soiled, removal of the garment can substantially increase the spread of soilage . . . since the garment must be pulled over the child's legs." (*Id*. at Col. 1:34-37).

49.    To solve this problem, LaFleur teaches the use of refastenable seams in place of bonded seams. Such a training pant can be "easily removed from the child" and "made resealable so that the [training pant] can be worn again." (*Id*. at Col. 1:6-11 and Col. 2:7-17). Specifically, as shown in Figure 5 below (annotated), the refastenable "disposable training panty" 60 of LaFleur includes a "set of overlapping flaps," i.e., side panels, that extend "from the

waist band 14 to the leg band 24." (*Id.* at Col. 4:20-26).

    50.    LaFleur further teaches that "[t]he overlapping flap portions are sealed together by mating, hook and pile, fastening strips 52 and 54," such as "velcro fastening strips." (*Id.* at Col. 4:26-29 and Col. 3:58-63). The resulting refastenable seams are positioned at the sides of the wearer over the hips. (*Id.* at Col. 4:29-33 ("[T]he entire front flap portion 61 . . . can be detached from the rear flap portion 63 . . . at each side in order to remove the garment when desired.")).



    51.    As shown in Figure 5 above, the hook and pile Velcro fasteners extend the entire (i.e., 100%) distance from the waist opening to each leg opening. (*Id.* at Col. 6:39-44; *see also id.* Claims 14-16 (claiming a pair of overlapping flaps that can be secured together to form a seam extending from the waist to the leg opening on each side of the article)).

    C.    <u>The Asserted Claims Are Obvious Over The Prior Art</u>

    52.    As discussed below, it is my opinion that the Asserted Claims of the '379 Patent are invalid as obvious in view of the prior art discussed below.

    53.    Claim charts comparing each limitation of the Asserted Claims with the prior art

is attached as Exhibit 15.

       1.    Claim 1 Is Obvious Over the 1996 Pull-Ups in View of LaFleur

54.     Claim 1 of the '379 Patent is directed to training pants having refastenable seams that cover about 80 to 100 percent of the distance between the waist opening and leg openings. Claim 1 also includes conventional training pant features (e.g., leg elastics, side panels, graphics, etc.).

55.     As shown in the claim charts in Exhibit 15, LaFleur teaches a refastenable seam that covers 100% of the distance between the waist and leg openings, and the 1996 Pull-Ups includes all of the other conventional the conventional training pant features listed in the claim. In my opinion, it would have been obvious to a person of ordinary skill in the art to replace the bonded seams in the 1996 Pull-Ups with the refastenable seam of LaFleur to arrive at Claim 1.

56.     As LaFleur recognized, when a soiled training pant with bonded seams was pulled over the child's legs, the soilage in the pant would spread to the child's legs. (Ex. 14, LaFleur, Col. 1:34-37). The 1996 Pull-Ups provided bonded seams for removal of the training pant from the child.

57.     LaFleur solved the soilage problem by replacing the bonded seams with refastenable seams formed by mating "hook and pile" (i.e., Velcro) fasteners 52, 54. (*Id.* at Col. 4:20-33 and Fig. 5). As a result, "the garment is easily removed from the child, and can be easily adapted for removal without manipulating the child's body through the waist and leg openings and further spreading the soilage." (*Id.* at Col. 2:10-14). According to LaFleur, the refastenable seams are "resealable so that the garment can be worn again if it has been removed to check for soilage" and it is determined that the child did not have an accident. (*Id.* at Col. 2:14-16).

58.     I understand that any need or problem known in the field at the time of invention can provide a reason for combining the prior art elements as claimed in the '379 Patent. Here,

the soilage problem was addressed by the 1996 Pull-Ups (with a bonded seam) and LaFleur (with a refastenable seam). It would have been obvious to a person of ordinary skill in the art to replace the bonded seams in the 1996 Pull-Ups with LaFleur's refastenable seam to address the problem of soilage.

59. I have been informed that, in connection with the related '067 Patent, the District Court reached the same conclusion with respect to LaFleur in combination with the 1989 Pull-Ups. Specifically, the District Court recognized that "[t]here are only a finite and limited number of predictable solutions to this [soilage] problem, one of which was the refastenable seam offered by LaFleur;" and "replacing the bonded seam of . . . training pants with the refastenable hook and loop seam . . . taught in LaFleur would have been obvious to a person with ordinary skill in the art to try." (Ex. 12, *Kimberly-Clark Worldwide, Inc.*, 900 F. Supp. 2d at 912).[2] I agree with the District Court's conclusion, which is equally applicable to the related '379 Patent.

60. I understand that K-C has asserted in this case and in the related IPR proceedings that the prior art did not "resolv[e] the complex problems one of ordinary skill in the art would have faced trying to dispose the fastening components of . . . LaFleur on stretchable side panels," including those of K-C's prior art Pull-Ups and Van Gompel. (*See* Ex. 27, K-C's Jan. 20, 2015 Response to Interrog. No. 9 at 4-5; *see also* Ex. 8, IPR2014-01021, K-C's Preliminary Response at 17). I disagree with K-C.

61. As an initial matter, I understand that in the Prior Litigation the District Court held that it would have been obvious to place the refastenable seams of LaFleur on the

---

[2] I also understand that K-C did not challenge these factual findings in its appeal, but only disputed the Court's analysis of the secondary considerations. (*See, e.g.*, Ex. 26, K-C Opening Br. at 55, *Kimberly-Clark Worldwide, Inc. v. First Quality Baby Products, LLC*, No. 2013-1493, 2013-1494 (Fed. Cir. Nov. 4, 2013))

elastomeric side panels of the 1989 Pull-Ups. (Ex. 12, *Kimberly-Clark Worldwide, Inc.*, 900 F. Supp. 2d at 912). Since the Court's decision is now final, it is my understanding that K-C is barred from raising this same issue here.

62. In addition, the '379 Patent does not mention any "complex problem" that could arise in placing fastening components on elastomeric (or stretchable) side panels. Rather, the '379 Patent simply states that "[t]he fastening components and the mating fastening components 82-85 can be adhered to the side panels 34 and 134 by *any means known to those skilled in the art* such as adhesive bonds, sonic bonds or thermal bonds." (Ex. 2, '379 Patent, Col. 16:32-35 (emphasis added)). K-C's assertion in this case, that replacing the permanently bonded seams of the prior art with refastenable seams "requires a level of skill that was well beyond that of the person of ordinary skill in the art" (Ex. 27, K-C's Jan. 20, 2015 Response to Interrog. No. 9 at 5), is contrary to the specification itself.

63. In this regard, K-C's own prior art discloses training pants and diapers having mechanical fasteners disposed on elastomeric side panels. (*See, e.g.*, Ex. 17, U.S. Patent No. 5,624,429 to Long (discussed below) and U.S. Patent No. 5,496,298 to Kuepper et al. (prior art K-C patent disclosing "elastomeric ears" for "training pants," where "a mechanical fastener such as the hook portion of a hook-and-loop material" is disposed on the elastomeric ear)).

64. In sum, it is my opinion that Claim 1 is invalid as obvious over the combination of the 1996 Pull-Ups and LaFleur.

### 2. Claim 2 Is Obvious Over the 1996 Pull-Ups In View of LaFleur

65. Claim 2 depends from Claim 1 and further requires that the "composite structure is a rectangular composite structure." As shown in the annotated photograph below and the claim charts in Exhibit 15, the composite structure of the 1996 Pull-Ups is rectangular.



66.     As discussed above, a person of ordinary skill in the art would have been motivated to combine the 1996 Pull-Ups with LaFleur.  As such, it is my opinion that Claim 2 is obvious over the 1996 Pull-Ups in view of LaFleur.

> 3.      Claim 3 Is Obvious Over: (a) the 1996 Pull-Ups and LaFleur and (b) the 1996 Pull-Ups and LaFleur in View of Surprise

67.     Claim 3 depends from Claim 1 and further requires that "each of the first and second front side panels and the first and second back side panels has an inner surface and an opposite outer surface, and the first and second fastening components comprise loop type fasteners disposed on the outer surface of the first and second back side panels and the first and second mating fastening components comprise hook or mushroom type fasteners disposed on the inner surface of the first and second front side panels."

68.     More succinctly, Claim 3 requires that the loop type fasteners be placed on the rear side panels (and face away from the wearer), while the hook type fasteners are placed on the

front side panels (and face toward the wearer).

69.     As discussed below, and shown in the claim charts in Exhibit 15, it is my opinion that Claim 3 is obvious over: (a) the 1996 Pull-Ups and LaFleur; and (b) the 1996 Pull-Ups and LaFleur in view of Surprise.

70.     With respect to the placement of the hook and loop fastening components, there are a limited number of options for the placement of fastening components on side panels.  In this regard, a training pant designer would have known that there were a finite set of options: (1) hooks can be placed on the inner or outer surface of the front side panels, and mating loops can be placed on the inner or outer surface of rear side panels; (2) loops can be placed on the inner or outer surface of the front side panels, and the mating hooks can be placed on the inner or outer surface of rear side panels; or (3) or some combination of (1) and (2).

71.     As discussed above, there was a design need for addressing the soilage problem, and LaFleur provided the solution with a refastenable training pant.  Given that there are only a finite number of predictable configurations for forming a refastenable seem on training pants with side panels, it would have been obvious to a person of ordinary skill in the art to try these options, including the configuration of Claim 3.  As such, it is my opinion that Claim 3 would have been an obvious design choice to one of ordinary skill in the art over the combination of the 1996 Pull-Ups and LaFleur.

72.     In addition, it is my opinion that Claim 3 would have been obvious to one of ordinary skill in the art over the combination of the 1996 Pull-Ups and LaFleur further in view of PCT Publication No. WO 95/12376 ("Surprise," Ex. 16).

73.     Surprise, published May 11, 1995, is assigned to K-C and discloses a fastening system for "children's training pants."  (Ex. 16, Surprise at p. 3:28-32.).  As shown in the annotated figures below and the claim charts in Exhibit 15, Surprise teaches that a "first

mechanical fastener," such as hook members 34, is attached to the "inner body-facing side" of the front side panels 26, while a "second mechanical fastener," such as loop members 36, is attached to the opposite, outer surface of the outer cover 12. (*Id.* at p. 4:15-20 and p. 8:14-25). Thus, Surprise explicitly teaches the requirements of Claim 3.



74.    Surprise explicitly teaches one of ordinary skill in the art to use the disclosed fastening system on a "children's training pants" in order to improve the fit of such articles, including the pant of LaFleur. In this regard, Surprise teaches that through this arrangement, the loop members 36 will be "located on the sides of the wearer, and, thus, exposed and available for engagement with the hook members 34." (*Id.* at p. 11:16-18). This allows the caregiver to "simultaneously engage both hook members 34 with their respective loop member 36"; simultaneous engagement "allows for achieving a proper fit the first time attachment of the hook-and loop members is made." (*Id.* at p. 11:18-23).

75.    One of ordinary skill in the art would understand that (1) Surprise's technique of placing loop fasteners on the outer surface of the rear side panels and hook fasteners on the inner

surface of the front side panels has been used to improve the fit of a training pant, and (2) Surprise's technique could be used to improve the fit of similar refastenable training pants—such as the one resulting from the combination of the 1996 Pull-Ups and LaFleur—in the same way.

76.     And, as taught in Surprise, placing hook fasteners on the inner surface of the front side panels and loop fasteners on the outer surface of the back side panels of the refastenable training pant resulting from the combination of the 1996 Pull-Ups and LaFleur would not have been beyond the skill of one of ordinary skill in the art.  Indeed, there were many known techniques for attaching hook and loop fasteners to side panels, including ultrasonic bonding, thermal bonding, adhesives and the like.  (*Id.* at p. 7:11-20).

77.     Therefore, one of ordinary skill in the art would have been motived to combine Surprise with the 1996 Pull-Ups and LaFleur to arrive at Claim 3.  Accordingly, it is my opinion that the claimed configuration would have been obvious to one of ordinary skill in the art over the combination of the 1996 Pull-Ups and LaFleur in view of Surprise.

4.     Claim 4 Is Obvious Over: (a) the 1996 Pull-Ups and LaFleur and (b) the 1996 Pull-Ups and LaFleur in View of Surprise

78.     Claim 4 depends from Claim 3 and further requires that "the first and second fastening components are sized larger than the first and second mating fastening components."

79.     As discussed below, and shown in the claim charts in Exhibit 15, it is my opinion that Claim 4 is obvious over: (a) the 1996 Pull-Ups and LaFleur and (b) the 1996 Pull-Ups and LaFleur in view of Surprise.

80.     I have been informed that, where the only difference between a claimed device and the prior art is the recitation of relative sizes or dimensions, and the claimed device would not perform differently than the prior art device, the claim will be obvious as a matter of law.  Claim 4 relates to the relative sizes of the fastening components.  One of ordinary skill in the art

would have understood the need to provide a certain amount of tolerance in the relative sizes of the fastening components, in order to make it easier for the user, in this case a parent or caregiver, to mate the fastening components and provide a better fit of the product on the child. Therefore, since this limitation is merely an obvious design choice, Claim 4 is obvious over the 1996 Pull-Ups and LaFleur.

81.    In addition, it is my opinion that Claim 4 is obvious over the 1996 Pull-Ups and LaFleur, further in view of Surprise.

82.    Surprise teaches loop fasteners with a "width . . . of from about 2.5 inches . . . to about 5.5 inches" and hook fasteners with a "width of about 0.5 inch" while the length dimensions of the hook and loop fasteners are similar.  (Ex. 16, Surprise at pp. 8:32-9:13).  As shown above in Figures 1 and 4 of Surprise (above), the first and second loop fasteners 36 on the back side panels 40 are wider and therefore larger than the first and second mating hook fasteners 34 on the front side panels 26.  Thus, Surprise clearly teaches the requirements of Claim 4.

83.    Surprise also teaches that the loop fasteners 36 are "dimensioned to ensure proper attachment of the diaper about the waist of a wearer . . . [and] prevent forming attachment points other than on the side of the diaper and within the desired distance from the transverse center plane" 60 so that "improved fit and less drooping" is achieved.  (*Id*. at pp. 8:36-9:5 and pp. 17:7-18:6).  In this regard, because the loop fasteners are wider than the hook fasteners, the hook fasteners can be engaged at different locations on the loop fasteners.  Thus, the fit of the pant can be loosened or tightened to adjust to differently sized children.

84.    In view of these teachings, one of ordinary skill the art would recognize that this same technique could be used to improve the fit and comfort of the refastenable training pant resulting from the combination of the 1996 Pull-Ups and LaFleur.

85.     Accordingly, it is my opinion that Claim 4 is obvious over the 1996 Pull-Ups and LaFleur in view of Surprise.

> 5.     Claim 5 Is Obvious Over: (a) the 1996 Pull-Ups and LaFleur and (b) the 1996 Pull-Ups and LaFleur in View of Surprise and Long

86.     Claim 5 depends from Claim 4 and further requires that "the loop type fasteners comprise integral portions of the back side panels."

87.     As discussed below, and shown in the claim charts in Exhibit 15, it is my opinion that Claim 5 is obvious over: (a) the 1996 Pull-Ups and LaFleur and (b) the 1996 Pull-Ups and LaFleur in view of Surprise and Long.

88.     I have been informed that, as a general legal matter, the use of a one piece (i.e., integral) construction instead of a multi-piece structure disclosed in the prior art is obvious as an engineering choice.  As a practical matter, this is also true in my experience.  In this regard, it was well known at the time the '379 Patent was filed that loops could be integrally formed on non-woven surfaces of diapers and training pants, or could be attached as a separate loop strip.  (*See, e.g.*, Long, discussed below).  The 1996 Pull-Ups already included side panels with a non-woven outer surface.  One of ordinary skill in the art would have known that such material can function as the "loops" in a mechanical fastening system, and could have easily selected a non-woven material that provides the desired bonding strength.  Thus, this limitation is obvious over the 1996 Pull-Ups and LaFleur.

89.     In addition, this limitation is disclosed by U.S. Patent No. 5,624,429 ("Long," Ex. 17).  Long, which issued on April 29, 1997, more than one year before the '379 Patent was filed, discloses a refastenable fastening system (e.g., hook and loop fasteners) for use in disposable absorbent articles (e.g., diapers and incontinence garments).  (Ex. 17, Long, Cols. 15:41-16:61).

90.     Long identifies the need for providing "improved securement with greater

resistance to premature pop-opens, . . . improved fit, greater comfort, [and] reduced irritation of the wearers skin." (*Id*. at Col. 1:28-37 and 59-63).

91.     As shown in Figure 1 below, Long discloses a disposable absorbent article 20 having elastomeric "side panels" 90, which are attached to side edges 116 of the back waistband portion 40. (*Id*. at Col. 3:59-64). Side panels can also be attached to the front side edges 118 of the front waistband portion. (*Id*. at Col. 12:45-50 and Col. 13:5-17). Long teaches that fastening components, including the loop fasteners, "desirably . . . may be ***integrally*** formed" on the layer which they are disposed. (*Id.* at Col. 20:34-40 (emphasis added)). For example, the side panels may be made of non-woven fabric, which can also serve as the loop fastener. (*Id*. at Col. 13:18-27, Col. 15:21-29 and Col. 20:13-15). In other words, the non-woven loop fasteners are integral with the side panels.

92.     Long further explains that the loop fastener can be an integral part of the backsheet 22, which in one embodiment includes side panels:

> [T]he loop material need not be limited to a discrete landing zone patch. Instead the loop material can, for example, be provided by a substantially continuous, outer fibrous layer which is ***integrated*** to extend over substantially the total exposed surface area of a cloth-like outer cover employed with the diaper 20. The resultant, cloth-like backsheet 22 can thereby provide the loop material for an operative "fasten anywhere" mechanical fastening system.

(*Id*. at Col. 20:24-32 (emphasis added); *see also id.* at Col. 12:62-67 (explaining that "side panels 90 can be integral[]" with the backsheet layer)).

93.     In view of this teaching, one of ordinary skill in the art would have been motivated to improve upon the training pant described in Claim 4 with the "integral" loop fasteners of Long. As noted by Long, the provision of integral loop fasteners provides added flexibility to the user, including the ability to "fasten anywhere" on the rear side panels. Moreover, the 1996 Pull-Ups already included side panels with a non-woven outer surface,

which material can be readily selected to function as the loop material in a mechanical fastening system.

94.    Accordingly, it is my opinion that Claim 5 is obvious over the 1996 Pull-Ups and LaFleur in view of Surprise and Long.

6.    Claim 6 Is Obvious Over the 1996 Pull-Ups and LaFleur in View of Surprise

95.    Claim 6 depends from Claim 3 and further requires that "each mating fastening component is spaced inward from the distal edge, the waist end edge, and the leg end edge of the respective front side panel."

96.    As discussed below, and shown in the claim charts in Exhibit 15, it is my opinion that Claim 6 is obvious over the 1996 Pull-Ups and LaFleur in view of Surprise.

97.    This limitation is disclosed by Surprise.  Specifically, the mating fastening components 34 of Surprise (shown in Figure 2 below), are each spaced inward from the distal edge, waist end edge, and leg end edge of the respective front side panel.  (Ex. 16, Surprise, Fig. 2).



98.    As discussed above with respect to Claim 3, a person of ordinary skill in the art would have been motivated to combine the teachings of Surprise with the 1996 Pull-Ups and LaFleur.

99. Accordingly, like Claim 3, Claim 6 is obvious over the 1996 Pull-Ups and LaFleur in view of Surprise.

### 7. Claim 7 Is Obvious Over: (a) the 1996 Pull-Ups and LaFleur and (b) the 1996 Pull-Ups and LaFleur in View of Long

100. Claim 7 requires that the "fastening components comprise integral portions of the back side panels, and wherein the mating fastening components are connected to the front side panels."

101. As discussed below, and shown in the claim charts in Exhibit 15, it is my opinion that Claim 7 is obvious over: (a) the 1996 Pull-Ups and LaFleur and (b) the 1996 Pull-Ups and LaFleur in view of Long.

102. As discussed above in connection with Claim 5, it would have been a matter of design choice to one of ordinary skill in the art to utilize an integral loop material on the side panels. Therefore, Claim 7 is obvious over the 1996 Pull-Ups and LaFleur.

103. In addition, as discussed above in connection with Claim 5, Long explicitly discloses loop type fastening components that comprise integral portions of the rear side panel, and mating fastening components (i.e., hooks) are connected to the front side panels. (Ex.17, Long, Col. 20:24-32). For the reasons discussed above, one of ordinary skill in the art would have been motivated to combine the 1996 Pull-Ups and LaFleur with Long.

104. Therefore, Claim 7 is also obvious over 1996 Pull-Ups and LaFleur in view of Long.

### 8. Claim 8 Is Obvious Over: (a) the 1996 Pull-Ups and LaFleur and (b) the 1996 Pull-Ups and LaFleur in View of Long

105. Claim 8 depends from Claim 7 and further requires that "the mating fastening components have a length-to-width ratio of about 5 or greater."

106. As discussed below, and shown in the claim charts in Exhibit 15, it is my opinion

that Claim 8 is obvious over: (a) the 1996 Pull-Ups and LaFleur and (b) the 1996 Pull-Ups and LaFleur in view of Long.

107.    As can be seen, Claim 8 relates to the proportions of the fastening components. In this regard, I have been informed that where the only difference between the prior art and the claims is the recitation of relative dimensions, the burden falls on the patentee to show that the claimed ratio achieves unexpected results relative to the prior art. Otherwise, the claim is obvious. The specification of the '379 Patent does not identify any purported unexpected results that the claimed ratio provides.

108.    I understand that a similar limitation was considered by the District Court in the Prior Litigation in connection with Claim 4 of U.S. Patent No. 6,454,751 ("the '751 Patent"). (*See* Ex. 18, Prior Litigation, 2012 U.S. Dist. LEXIS 129646 (E.D. Wis. Sept. 12, 2012)). Claim 4 of the '751 Patent was directed to a similar refastenable training pant where "each of the first and second fastening components has . . . a length-to-width ratio of about 5 or greater." (*Id.* at *7). The District Court found that prior art PCT Publication No. WO 97/46197 ("Kling") disclosed a refastenable training pant having fastening components with a range of length-to-width ratios. (*Id.* at *18-19).

109.    The District Court further stated that "K-C d[id] not make any showing that the length-to-width ratio of the fastening element . . . is somehow critical in that the claimed ratio achieves unexpected results relative to the prior art's generally stated range." (*Id.* at *18). In this regard, the specification of the '379 Patent does not identify any purported unexpected results that the claimed ratio provides. This is consistent with my opinion that the recited ratios are merely an obvious design choice to one of ordinary skill in the art.

110.    In addition, Claim 8 is obvious over the 1996 Pull-Ups and LaFleur in view of Long. Long discloses fastening components ("fastening region 50") of various lengths and

widths, including a length 68 of 8.9 cm and a width 69 of 1.27 cm. (Ex. 17, Long, Col. 16:38-61). In this embodiment, the fastening component has a length-to-width ratio of 7. These dimensions are shown in Figure 3 below:



111.   As can be seen, Long has long, narrow fasteners. LaFleur has similar, narrow fasteners that span the entire distance between the waist and leg openings. Therefore, one of ordinary skill in the art would have understood that the dimensions of Long, which are simply design choices, could be used with the refastenable pant of LaFleur.

112.   Accordingly, it is my opinion that Claim 8 is invalid over the 1996 Pull-Ups and LaFleur in view of Long.

### 9.   Claim 10 Is Obvious Over the 1996 Pull-Ups and LaFleur

113.   Dependent Claim 10 depends from Claim 1 and requires that "each front side panel waist end edge forms part of the front waist edge, and wherein each back side panel waist end edge forms part of the back waist edge."

114.   As discussed below, and shown in the claim charts in Exhibit 15, it is my opinion

that Claim 10 is obvious over the 1996 Pull-Ups and LaFleur.

115.    This limitation is found in the 1996 Pull-Ups. Specifically, each of the front and back side panels of the 1996 Pull-Ups forms part of the front and back waist edge as seen in the below photographs of the front side panel (left photo) and back side panel (right photo).



116.    Accordingly, it my opinion that Claim 10 is obvious over the 1996 Pull-Ups and LaFleur.

        10.    Claim 11 Is Obvious Over the 1996 Pull-Ups and LaFleur

117.    Dependent Claim 11 requires "a pair of containment flaps located along the entire length of the absorbent chassis along the opposite side edges of the absorbent chassis, each containment flap including at least one flap elastic member and each containment flap defining an at least partially unattached edge."

118.    As discussed below, and shown in the claim charts in Exhibit 15, it is my opinion

that Claim 11 is obvious over the 1996 Pull-Ups and LaFleur.

119.    As an initial matter, the '379 Patent acknowledges that containment flaps were old, dating back to, at least, 1987.  Specifically, the '379 Patent admits that "[s]uitable constructions and arrangements for the containment flaps 46 are ***generally well known to those skilled in the art*** and are ***described in U.S. Pat. No. 4,704,116 issued Nov. 3, 1987 to Enloe***, which is incorporated herein by reference."  (Ex. 2, '379 Patent, Col. 10:4-8) (emphasis added).

120.    In any event, as discussed above (and shown in the photographs below), the 1996 Pull-Ups includes containment flaps located along the entire length of the absorbent chassis along the opposite side edges of the absorbent chassis.  As can be seen, each containment flap includes an elastic member and a partially unattached edge.



121.    Accordingly, it is my opinion that Claim 11 is invalid as obvious over the 1996

Pull-Ups and LaFleur.

           11.   <u>Claim 12 Is Obvious Over the 1996 Pull-Ups and LaFleur</u>

122.    Claim 12 depends from Claim 1 and requires "an elastomeric front waist elastic member and an elastomeric back waist elastic member."

123.    As discussed below, and shown in the claim charts in Exhibit 15, it is my opinion that Claim 10 is obvious over the 1996 Pull-Ups and LaFleur.

124.    As shown in the photographs below, the 1996 Pull-Ups has an elasticized front waistband (left photo) and an elasticized back waist band (right photo). I measured the relaxed length of the front and back waist member to be approximately 5.0 inches, and the elongated length of the waist members to be approximately 6.0 inches. These measurements yield a elongation of approximately 20 percent.

125.    As discussed above, the '379 Patent defines the term "elastomeric" as a material that, among other things, "can be elongated by at least 25 percent of its relaxed length." However, the specific elongation percentage selected is merely a design choice to a person of ordinary skill in the art, which would be selected based upon the size and weight of intended wearer and the degree of elasticity of the side panels, since the side panels and waist elastics work together. In this regard, a training pant designer would simply adjust the elasticity of the waist bands to minimize drooping, while avoiding irritation and discomfort to the wearer.




126. As previously mentioned, the 1996 Pull-Ups is a commercial embodiment of Van Gompel. Van Gompel teaches that the waistband can be constructed of "elastomeric materials" and have "elasticity from about 10% to about 500%." (Ex. 13, Van Gompel, Cols. 4:31-5:38, Cols. 10:53-11:2 and Fig. 5).

127. I also understand that a similar limitation was at issue in the Prior Litigation. Specifically, Claim 9 of the '067 Patent was directed to a refastenable training pant having "an elastomeric front waistband disposed in the front waist region" and "an elastomeric back waistband disposed in the back waist region." (Ex. 28, '067 Patent, Claim 9). I understand that K-C did not contest that the 1989 Pull-Ups satisfied this limitation, and Claim 9 of the '067 Patent was therefore held invalid by the District Court.

128. As a result, Claim 12 is obvious over the combination of the 1996 Pull-Ups and LaFleur.

12. Claim 13 Is Obvious Over the 1996 Pull-Ups and LaFleur in View of Brandon

129. Claim 13 depends from Claim 1 and requires that "the outer cover graphic includes simulated elastic leg band components and simulated elastic waistband components, and wherein the outer cover graphic further includes registered wetness indicators."

130. As discussed below, and shown in the claim charts in Exhibit 15, it is my opinion

that Claim 13 is obvious over the 1996 Pull-Ups and LaFleur in view of PCT Publication No. WO 97/24094 to Brandon et al. ("Brandon," Ex. 19).

131.    I have been informed that printed graphics, such as the claimed simulated elastic leg bands and waist bands, are not patentable unless there is a new and unobvious functional relationship between the printed matter and the substrate.  The '379 Patent does not identify any such relationship between these printed graphics and the article.  Rather, the specification identifies such graphics as "appearance-related components."  (Ex. 2, '379 Patent, Col. 11:24-37).

132.    In any event, as discussed above, the 1996 Pull-Ups includes simulated elastic leg band components and simulated elastic waistband components.  These graphics are registered on the pant, along with a cartoon-like scene.  However, the pant does not appear to include a registered wetness indicator.  But this feature was disclosed by Brandon.

133.    With respect to the positioning of these printed graphics, the '379 Patent relies upon, and incorporates by reference, Brandon (discussed above).  Brandon discloses outer cover graphics 28, 42 (e.g., drawings of animals, simulated "fly openings," simulated ruffles) disposed on the outer cover 34.  (Ex. 19, Brandon, Fig. 2A).  The outer cover graphics of Brandon (*see* Figure 2A) are identical to the outer cover graphics of the '379 Patent (*see* Figure 2).  As shown in Figure 2A of Brandon, the outer cover graphics 38, 42 "simulate functional components such as elastic leg bands, elastic waistbands" and include "appearance-related" components such as "registering wetness indicators."  (*Id.* at Figs. 1-2 and 2A and p. 4:23-33, p. 5:11-19,  p. 7:5-8, p. 10:1-13 and p. 11:6-12).



| **Fig. 2 of the '379 Patent** | **Fig. 2A of Brandon** |

134. Moreover, the relevant disclosure in the '379 Patent of these "appearance-related components" is identical to the disclosure of these components in Brandon (common language underlined):

| Disclosure of '379 Patent | Disclosure of Brandon |
|---|---|
| Examples of appearance-related components include, but are not limited to, graphics; <u>highlighting or emphasizing leg and waist openings in order to make product shaping more evident or visible to the user; highlighting or emphasizing areas of the product to simulate functional components such as elastic leg bands, elastic waistbands, simulated "fly openings" for boys, ruffles for girls; highlighting areas of the product to change the appearance of the size of the product; registering wetness indicators, temperature indicators, and the like in the product; registering a back label, or a front label, in the product; and registering written instructions at a desired location in the product.</u><br><br>(Ex. 2, '379 Patent, Col. 11:26-37) | Examples of components that are appearance-related include, but are not limited to, the registration of graphics; <u>highlighting or emphasizing leg and waist openings in order to make product shaping more evident or visible to the user; highlighting or emphasizing areas of the product to simulate functional components such as elastic leg bands, elastic waistbands, simulated "fly openings" for boys, ruffles for girls; highlighting areas of the product to change the appearance of the size of the product; registering wetness indicators, temperature indicators, and the like in the product; registering a back label, or a front label, in the product; and registering written instructions at a desired location in the product.</u><br><br>(Ex. 19, Brandon, p. 4:25-33) |

135.    Given the 1996 Pull-Ups already included multiple registered graphics on its outer cover, it would have been a trivial modification for one of ordinary skill in the art to also include a registered wetness indicator, such as that disclosed by Brandon.

136.    Brandon teaches a training pant similar to the 1996 Pull-Ups. Wetness indicators assist in toilet training by allowing a child to recognize when the article has been soiled and therefore further solve the problems addressed by the prior art. A person of ordinary skill in the art would have recognized that, since registered wetness indicators have been used to improve the training pant disclosed by Brandon, they could have been used to improve the 1996 Pull-Ups and LaFleur in the same way.

137.    Thus, for the same reasons set forth above with respect to combining the 1996 Pull-Ups and LaFleur (e.g., both addressed the soilage problem), one of ordinary skill in the art would have been motivated to combine Brandon, including registered wetness indicator graphics, with the 1996 Pull-Ups and LaFleur.

138.    It is therefore my opinion that Claim 13 is obvious over the 1996 Pull-Ups and LaFleur in view of Brandon.

### 13.    Claim 14 Is Obvious Over the 1996 Pull-Ups and LaFleur in View of Kuen

139.    Claim 14 depends from Claim 1 and requires "a surge layer adapted to receive and temporarily store liquid along a mutually facing surface with the absorbent assembly."

140.    As discussed below, and shown in the claim charts in Exhibit 15, it is my opinion that Claim 14 is obvious over the 1996 Pull-Ups and LaFleur in view of PCT Publication No. WO 97/31602 ("Kuen," Ex. 20).

141.    Kuen, which is assigned to K-C, discloses a training pant with the identical surge layer as that described in the '379 Patent.  Kuen was published in September 4, 1997, more than one year before the '379 Patent was filed.  (Ex. 20, Kuen, Cover).  As shown below, the training pant of Kuen is similar to the training pant of Van Gompel.  However, the training pant of Kuen also includes a surge layer 58 "constructed and designed primarily to receive, temporarily store, and transport liquid along the mutually facing surface with absorbent pad 56, thereby maximizing the absorbent capacity of absorbent structure 32."  (*Id.* at p. 10:18-20).



| Fig. 1 of Kuen | Fig. 2 of Van Gompel |



**FIG. 3**

Absorbent Pad

Surge Layer

142. Further, as shown below, the surge layer of Kuen is identical to the surge layer of

the '379 Patent (common language underlined):

| Surge Layer of Kuen | Surge Layer of '379 Patent |
|---|---|
| One suitable construction and design of a surge layer 58 is <u>a material having a basis weight of about 50 grams per square meter, and comprising a through-air-bonded-carded web</u> | One suitable material is referred to as a surge layer (not shown) and comprises <u>a material having a basis weight of about 50 grams per square meter, and comprising a through-air-</u> |

39

| | |
|---|---|
| of a homogenous blend of 60 percent 3 denier bicomponent fiber comprising a polyester core/polyethylene sheath, commercially available from BASF Corporation, and 40 percent 6 denier polyester fiber, commercially available from Hoechst Celanese.<br><br>(Ex. 20, Kuen, p. 10:20-25) | bonded-carded web of a homogenous blend of 60 percent 3 denier bicomponent fiber comprising a polyester core/polyethylene sheath, commercially available from BASF Corporation, and 40 percent 6 denier polyester fiber, commercially available from Hoechst Celanese . . .<br><br>(Ex. 2, '379 Patent, Col. 13:27-35) |

143.    Like the 1996 Pull-Ups, Kuen is directed to a pant for use in toilet training children.  In designing a training pant, as with the design of all absorbent articles (e.g., diapers, adult incontinence), one important goal is to maximize absorbency and minimize leakage (i.e., soilage).  It was well known at the time of the alleged invention that surge layers, such as that disclosed by Kuen, were useful in obtaining these goals.  Therefore, one of ordinary skill in the art would have been motivated to incorporate the surge layer of Kuen into the refastenable training pant formed by the combination of the 1996 Pull-Ups and LaFleur in order to improve upon the prevention of spreading soilage on the child.  Accordingly, it is my opinion that Claim 14 is invalid as obvious over the 1996 Pull-Ups and LaFleur in view of Kuen.

### 14.    Claim 15 Is Obvious Over the 1996 Pull-Ups and LaFleur

144.    Claim 15 depends from Claim 1 and further requires that "the leg elastic members have front terminal points located adjacent longitudinally innermost parts of the front side panels and back terminal points located adjacent longitudinally innermost parts of the back side panels."

145.    As discussed below, and shown in the claim charts in Exhibit 15, it is my opinion that Claim 15 is obvious over the 1996 Pull-Ups and LaFleur.

146.    The leg elastic members of the 1996 Pull-Ups have terminal points located adjacent longitudinally to the innermost parts of the front (left photo) and back (right photo) side panels.




147.     Accordingly, Claim 15 is invalid as obvious over the combination of the 1996 Pull-Ups and LaFleur.

15.     Claim 16 Is Obvious Over the 1996 Pull-Ups and LaFleur

148.     Claim 16 depends from Claim 1 and further requires that "the training pant is prefastened to provide a pant-like product for the user."

149.     As discussed below, and shown in the claim charts in Exhibit 15, it is my opinion that Claim 16 is obvious over the 1996 Pull-Ups and LaFleur.

150.     I have been informed that, in the prior litigation involving a process patent, the District Court construed the term "***pre-fastened*** disposable pants" as "disposable pants ***the side panels of which are fastened or connected during manufacture and prior to sale.***"  (Ex. 21, Prior Litigation, ECF No. 334 at 15) (emphasis added).  I agree with the District Court's construction and, as noted above, understand that First Quality has proposed a similar construction in this case.

151. The District Court also found that "[t]he permanently bonded training pants that K-C's 'easy open pull-ups' were intended to improve on [e.g., the 1996 Pull-Ups] are also pre-fastened, that is, fastened before they are sold." (*Id.*). I agree with the District Court's construction and related finding. The 1996 Pull-Ups is a training pant with side panels that are connected (i.e., permanently sealed) during and manufacture and prior to sale to provide a pant-like product for the user. LaFleur also discloses a training pant that is prefastened to provide a pant-like product for the user. (Ex. 14, LaFleur, Figs. 1 and 5, Col. 4:20-33 and Claims 14-16).

152. As discussed above in connection with Claim 1, one of ordinary skill in the art would be motivated to combine the 1996 Pull-Ups with the refastenable seams of LaFleur. Therefore, it is my opinion that Claim 16 is obvious over the 1996 Pull-Ups in view of LaFleur.

### i. Claim 16 Is Also Invalid Under K-C's Proposed Construction

153. I also understand that, even though the term "prefastened" has been construed by the District Court, K-C is proposing a new construction in this litigation. Specifically, as noted above, I understand that K-C proposes that this limitation be construed to mean that "the fastening components and mating fastening components of the side panels of the training pant are fastened or otherwise connected during manufacture and prior to sale such that the user is provided with a pant-like product."

154. It appears that K-C is confusing "prefastened" with "refastenable" (i.e., having "fastening components" and "mating fastening components") since panels can be prefastened without being refastenable, as in the 1996 Pull-Ups. Nevertheless, even under K-C's interpretation, this claim is still invalid. Prefastened, refastenable, training pants were widely known in the prior art at the time of the alleged invention.

155. For example, U.S. Patent No. 6,210,388 ("Widlund," Ex. 22), the PCT application of which was published in 1995, discloses a method for manufacturing a "pants-type diaper" (i.e.,

"training pants") that is prefastened and "releasable and refastenable." (Ex.22, Widlund, Abstract, Col. 1:17-37, Col. 1:46-52, Col. 4:50-52, Col. 5:49-Col. 6:4 and Figs. 8, 8A, 11-12).

156. The "front and the rear side parts of the pant diaper are joined together by means of a releasable and refastenable fastener means 20" (e.g., "VELCRO"). (*Id.* at Cols. 5:56-6:4). The "releasable and refastenable" fasteners allow the wearer (e.g., a child) to pull-on the pant "to its correct position in the same way as a pair of underpants," yet the pant can also be "removed and changed" like a diaper without soiling the wearer. (*Id.* at Cols. 5:60-6:3).

157. Figures 11 and 12 show the Widlund pant before it has been folded in half.



158. As shown in Figure 11, the pant 36 includes "fastener elements" 37 disposed on the "rear side parts" (i.e., back side panels) and "fastener elements" 38 disposed on the "front side parts" (i.e., front side panels). (*Id.* at Col. 7:66-Col. 8:29 and Figs. 11-12).

159. The pant is folded in half after the fastening components 38 have been inverted "so that the front and the rear side parts thereof are placed edge-to-edge." (*Id*. at Col. 7:66-Col. 8:29).

160. "The coacting parts 37, 38 [i.e., hooks and loops] are pressed firmly against one another" to refastenably engage the side panels, thereby forming a prefastened and refastenable

training pant, as shown in Figure 8 below:



**FIG. 5**

161. Similar prefastened and refastenable training pants were also taught by others, including U.S. Patent No. 5,779,831 ("Schmitz," Ex. 23), the PCT application of which was published in 1995, discloses a process for manufacturing a "disposable absorbent article of the pull-on type" (i.e., a training pant) having refastenable "overlapping side seams" (also known as lap seams). (Ex. 23, Schmitz, Col. 2:34-49, Col. 5:38-40, 50-61 and Fig. 1). Figures 1 and 1a of Schmitz are annotated below to show the basic structure of this refastenable training pant:



162. As can be seen, the Schmitz pant has a "back panel" 5 (i.e., back waist region) connected to a "front panel" 3 (i.e., front waist region) by "side seams" 7, 9. (*Id.* at Col. 5:37-48).

The "side seams" 7, 9 "are formed by overlapping parts of the front panel 3 and back panel 5." (*Id.*). The overlapping side panels contain "patches of hook-type and loop-type material" (e.g., "Velcro"), which allow the pant to be "unfastened for inspection" and "be re-closed by the user for further use." (*Id.* at Col. 5:50-61).

163. I also understand that, in the Prior Litigation, the District Court acknowledged that Schmitz disclosed a prefastened pant, as construed by K-C. (*See, e.g.*, Ex. 24, Prior Litigation, ECF No. 813 at 2) (finding that Schmitz "discloses a process for positioning the sides of a refastenable garment so that the fastening components are facing each other after the pant is folded and can be fastened together at a high rate of speed.").

164. Given the express teachings of Widlund and Schmitz to manufacture prefastened and refastenable training pants, it would have been obvious to ordinary skill in the art to manufacture and sell the training pant of Claim 1 in this same configuration.

165. Accordingly, it is my opinion that, even under K-C's construction, Claim 16 is obvious over the 1996 Pull-Ups and LaFleur in view of Widlund or Schmitz.

16. <u>Claim 18 Is Obvious Over: (a) the 1996 Pull-Ups and LaFleur in View of Van Gompel and (b) the 1996 Pull-Ups and LaFleur in View of Long</u>

166. Claim 18 depends from Claim 1 and further requires that "the front side panels are non-stretchable."

167. As discussed below, and shown in the claim charts attached in Exhibit 15, it is my opinion that Claim 18 is obvious over: (a) the 1996 Pull-Ups and LaFleur in View of Van Gompel and (b) the 1996 Pull-Ups and LaFleur in View of Long.

168. As an initial matter, I note that the material selected for the side panels is merely a design choice to one of ordinary skill in the art. In this regard, there are a finite number of material types from which to construct side panels: stretchable or non-stretchable. Accordingly,

Case 1:14-cv-01466-WCG   Filed 01/23/15   Page 48 of 55   Document 94

it would have been to one of ordinary skill in the art to try both options.

169. In addition, the benefits of using non-stretchable components (e.g., fasteners) in absorbent articles, as opposed to stretchable components, were well-known at the time of the invention. For example, non-stretchable fastening components could be used to direct tensile forces away from the leg openings, and distribute these forces to other areas or components of the absorbent article (e.g., the other cover). Indeed, K-C's own prior art patents discuss this known benefit. (*See, e.g.*, Ex. 25, U.S. Patent No. 4,923,456 to Proxmire et al., Col. 10:42-47 ("The placement and positioning of a fastening system which is nonstretchable can reduce forces near the leg opening and direct forces across the outer cover to support the absorbent, especially when wet, resulting in reduced diaper sag and droop . . . .")).

170. With respect to the construction of side panels, the '379 Patent incorporates by reference the contents of Van Gompel. (Ex. 2, '379 Patent, Col. 14:50-57). In this regard, Van Gompel discloses side panels comprised of both stretchable and "non-stretchable" material. (*See, e.g.*, Ex. 13, Van Gompel, Col. 3:19-22 ("Side panel 6 includes stretchable side member 18 and stretchable side member 20 connecting intermediate member 22 which is made of a nonstretchable material.")).

171. Furthermore, Long discloses side panels that can be located in the "front" of the diaper, and can be made of either a "substantially non-elastomeric material" or an "elastomeric material." (Ex. 17, Long, Col. 13:5-8 and 18-27). Based on this teaching, a person of ordinary skill in the art would have understood that non-elastic (i.e., non-stretchable) side panels were interchangeable with—and could easily replace—elastomeric or stretchable side panels. As such, it would have been an obvious design choice to make the front side panels of the 1996 Pull-Ups and the pant of LaFleur non-stretchable, as taught in Long.

172. Accordingly, it my opinion that Claim 18 is invalid over the 1996 Pull-Ups and

LaFleur in view Van Gompel or Long.

17. Claim 23 Is Obvious Over the 1996 Pull-Ups and LaFleur

173. Claim 23 depends from Claim 1 and further requires that "the front side panels are longitudinally spaced from the back side panels by a distance equal to from about 35 to about 60 percent of the overall length dimension of the training pant."

174. As discussed below, and shown in the claim charts in Exhibit 15, it is my opinion that Claim 23 is obvious over the 1996 Pull-Ups and LaFleur.

175. The 1996 Pull-Ups meet this limitation. Specifically, the 1996 Pull-Ups (Size 3) have an overall length of about 21 inches. The longitudinal distance between the front and back side panels is about 7.5 inches. Therefore, the distance between the side panels is approximately 37 percent of the overall length dimension of the pant.



176.    This is not surprising given that the 1996 Pull-Ups is a commercial embodiment of Van Gompel.  In this regard, Van Gompel teaches that the training pant should have side panels with a length dimension of 5-50%—and ***most preferably 30-40%***—of the overall length dimension of the absorbent chassis.  (Ex. 13, Van Gompel, Cols. 3:66-4:7 and Fig. 5).  Assuming that each side panel comprises about 30% of the overall length dimension, as Van Gompel teaches, the distance between the side panels is about 40% of the overall length dimension of the training pant.

177.    Accordingly, it is my opinion that Claim 23 is obvious over the combination of the 1996 Pull-Ups and LaFleur.

18.    Claim 24 Is Obvious Over: (a) the 1996 Pull-Ups and LaFleur and (b) the 1996 Pull-Ups and LaFleur in View of Long

178.    Claim 24 depends from Claim 1 and further requires that "the front side panels do not comprise elastic materials."

179.    As discussed below, and shown in the claim charts in Exhibit 15, it is my opinion that, Claim 24 Is Obvious Over: (a) the 1996 Pull-Ups and LaFleur and (b) the 1996 Pull-Ups and LaFleur in View of Long.

180.    As discussed above in connection with Claim 18, the material selected for the side panels is merely a design choice to one of ordinary skill in the art.  In any event, LaFleur discloses non-elastomeric side panels.  Specifically, during the prior litigation, K-C explained that LaFleur "disclos[es] refastenable seams only on non-elastomeric materials." (Ex. 12, *Kimberly-Clark Worldwide, Inc.,* 900 F. Supp. 2d 903 at 913).

181.    In addition, Long teaches that side panels 90 can be located in the "front" waistband portion and can be "composed of a substantially non-elastomeric material, such as polymer films, woven fabrics, nonwoven fabrics or the like."  (Ex. 17, Long, Col. 13:5-8 and

13:18-21).

182.    Accordingly, it is my opinion that Claim 24 is also obvious over the 1996 Pull-Up and LaFleur in view of Long.

19.    Claim 25 Is Obvious Over the 1996 Pull-Ups and LaFleur in View of Additional References

183.    Independent Claim 25, which spans nearly 100 lines, merely combines each of the elements of Claim 1 with some of the additional known elements recited in the dependent claims above, including: containment flaps (Claim 11), front/back waist elastics (Claim 12), printed graphics (Claim 13), a surge layer (Claim 14), the placement of the hook and loop fastening components (Claim 3), the length-to-width ratio of the fastening components (Claim 8), and that the pant is "prefastened" (Claim 16).

184.    As discussed below, and shown in the claim charts in Exhibit 15, it is my opinion that Claim 25 is obvious over: (a) the 1996 Pull-Ups and LaFleur in view of Brandon and Kuen; and (b) the 1996 Pull-Ups and LaFleur in view of Brandon, Kuen, Long and Surprise.

185.    As discussed above, all of the elements of Claim 25 were old and disclosed by the prior art, including the 1996 Pull-Ups, LaFleur, Brandon and Kuen.  Other elements, such as the dimensions of the pant and the placement or selection of particular components, are merely design choices that would have been obvious to a person of ordinary skill in the art.  And, for the reasons discussed above, it would have been obvious to one of ordinary skill in the art to combine these known features to arrive at the pant of Claim 25.

186.    Specifically, the 1996 Pull-Ups, Kuen and Brandon are all iterations of K-C's prior art, non-refastenable, training pant.  One of ordinary skill in the art would have understood that the various features of this very similar prior art could be easily combined.  In addition, as discussed above with respect to Claim 14, it was widely known that a surge layer, such as that

disclosed by Kuen, could be used to further improve the performance (i.e., minimize leakage and soilage) of a training pant. Further, for the same reasons discussed above with respect to Claim 13, it would have been obvious to include the "registered wetness indicator" of Brandon in the 1996 Pull-Ups, to further improve the pant and reduce soilage.

187.    As can be seen, the 1996 Pull-Ups, Kuen and Brandon, are all directed to solving, among other things, the same soilage problem identified by LaFleur. Accordingly, as the Court already found in connection with the 1989 Pull-Ups, it would have been obvious to combine LaFleur with the 1996 Pull-Ups, Brandon and Kuen.

188.    In addition, Long and Surprise explicitly disclose the recited dimensions and placement of the fastening components. Therefore, Claim 25 is also obvious over the 1996 Pull-Ups and LaFleur in view of Brandon, Kuen, Long and Surprise.

189.    Specifically, Long teaches well-known techniques for improving the comfort and securement of disposable absorbent products, such as the 1996 Pull-Ups and the training pants of Brandon, Kuen, and LaFleur. Similarly, Surprise teaches the use of differently sized fasteners to improve the fit of a refastenable training pant. One of ordinary skill in the art would have been motivated to use the techniques of Long to improve upon the claimed refastenable training pant and the technique taught in Surprise to improve the fit of this pant.

20.    Claim 27 Is Obvious Over the 1996 Pull-Ups and LaFleur in View of Additional References

190.    Claim 27 depends from Claim 25 and further requires that "the front side panels are non-stretchable."

191.    As discussed above in connection with Claim 18, and shown in the claim charts in Exhibit 15, the material selected for the side panels is merely a design choice to one of ordinary skill in the art. In addition, the benefits of using non-stretchable components (e.g., fasteners) in

absorbent articles, as opposed to stretchable components, were well-known at the time of the invention.

192.    Furthermore, as discussed above, non-stretchable fastening components were explicitly disclosed by Van Gompel and Long.  Based on these teachings, a person of ordinary skill in the art would have understood that non-elastic (i.e., non-stretchable) side panels were interchangeable with elastomeric side panels, and vice versa.

193.    Accordingly, it is my opinion that Claim 27 is invalid over the combination of the references discussed above in connection with Claim 25 in view of Van Gompel or Long.

21.    Claim 28 Are Obvious Over the 1996 Pull-Ups and LaFleur in View of Additional References

194.    Claim 28 depends from Claim 25 and further requires that "the front side panels are longitudinally spaced from the back side panels by a distance equal to from about 35 to about 60 percent of the overall length dimension of the training pant."

195.    As discussed above in connection with Claim 23, and shown in the claim charts in Exhibit 15, the 1996 Pull-Ups satisfies this limitation.

196.    Accordingly, it is my opinion that Claim 28 is obvious for the same reasons as set forth above in connection with Claim 25.

22.    Claim 29 Is Obvious Over the 1996 Pull-Ups and LaFleur in View of Additional References

197.    Claim 28 depends from Claim 25 and further requires that "the front side panels do not comprise elastic materials."

198.    As discussed above in connection with Claim 24, and shown in the claim charts attached in Exhibit 15, non-elastic materials are disclosed by LaFleur and Long.

199.    Accordingly, it is my opinion that Claim 28 is obvious for the same reasons as set forth above in connection with Claim 25.

VII.    SECONDARY CONSIDERATIONS OF NONOBVIOUSNESS

200.    I understand that, in the Prior Litigation, K-C argued that its refastenable "Pull Ups" training pants practice claims of the '067 Patent, and alleged that this product was commercially successful due to its refastenable seams, and identified other alleged secondary considerations, including (a) long felt but unsolved needs; (b) failure of others; (c) industry skepticism; (d) praise by others; and (e) copying.

201.    I have been informed that there must be a connection (or nexus) between the alleged secondary consideration and the novel features of the claims.  Since disposable training pants having refastenable seams and the other claimed features were known, there can be no nexus between the secondary consideration and any allegedly novel claim feature.  In this regard, I understand that, in connection with the '067 Patent, the District Court found that K-C failed to establish a nexus to any novel feature of the claims.  I also understand that this finding was affirmed on appeal and is therefore final.

202.    I reserve the right to supplement this section should K-C provide more detailed information regarding secondary considerations.

VIII.    CONCLUDING REMARKS

203.    I understand that additional information may be forthcoming that may require me to amend or supplement my opinions.


Hofheim am Taunus, Germany                                    _____
Dated: January 22, 2015                                                          John Blevins