UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

KIMBERLY-CLARK WORLDWIDE INC. et al.,

        Plaintiffs,

    v.                                Case No. 14-CV-1466

FIRST QUALITY BABY PRODUCTS LLC et al.,

        Defendants.

FIRST QUALITY BABY PRODUCTS LLC et al.,

        Counterclaim-Plaintiffs,

    v.

KIMBERLY-CLARK WORLDWIDE INC. et al.,

        Counterclaim-Defendants.

**DECISION AND ORDER GRANTING [65] MOTION TO STAY AND SEPARATE, DENYING IN PART [70] MOTION TO DISMISS AND STRIKE AND GRANTING [84] MOTION FOR SUMMARY JUDGMENT**

      Kimberly-Clark Worldwide Inc. et al. (collectively "K-C") and First Quality Baby Products

LLC et al. (FQ) are competitors in the disposable training pants market. K-C brought this, its most

recent action against FQ, for infringement of U.S. Patent No. 8,747,379 ("the '379 patent"), which

is a continuation of an earlier KC patent that this court found invalid in a previous case between the

parties. FQ counterclaimed alleging, among other things, violations of Section 2 of the Sherman

Antitrust Act, 15 U.S.C. § 2, the Wisconsin Antitrust Act, Wis. Stat. § 133.01 *et seq.* and unfair

trade practices under Wis. Stat. § 120.10 (hereinafter "the antitrust counterclaims"). Before the

court are K-C's motion to dismiss or, alternatively, to stay and separate FQ's antitrust counterclaims, and FQ's motion for summary judgment on K-C's res judicata affirmative defense. For the reasons below, the motion to dismiss will be denied in part, the motion to stay and separate will be granted and the motion for summary judgment will be denied.

## BACKGROUND

K-C is a global manufacturer of consumer products including its Huggies® Pull-Ups® brand disposable training pants for toilet-training children. FQ is part of an independent group of family-owned companies that manufactures products sold by retailers as "private label" brands under their own store names. Since 2009, these parties have been engaged in litigation related to a number of patents held by K-C. In February 2009, FQ filed a declaratory judgment action against K-C in the Middle District of Pennsylvania seeking a ruling that FQ's baby diaper products did not infringe on K-C's patents. Shortly thereafter, K-C filed an action in Texas alleging FQ was infringing on its diaper and adult incontinence patents. After the declaratory judgment suit was dismissed, the Texas suit was transferred to the district court in Pennsylvania. In July 2010, FQ asserted several counterclaims in the Pennsylvania action, including that K-C was maintaining a monopoly in the disposable training pant market in violation of Section 2 of the Sherman Act. (ECF No. 71-59, ¶¶ 109–14.) FQ alleged K-C had unlawfully acquired and maintained a monopoly in the market by *inter alia*, "[t]hreatening to sue and suing private label manufacturers such as First Quality on patents that K-C knows are invalid, unenforceable, not infringed and/or procured by fraud on the Patent Office[.]" (*Id.* ¶ 112(a).)

2

On September 21, 2009, while the Pennsylvania litigation was still pending, K-C filed an action in this court alleging infringement of a number of patents K-C holds on disposable training pant products and the processes it uses to manufacture them. After that suit was filed, FQ re-designed several of its products and processes to avoid the asserted patents, and as K-C learned of FQ's new designs and processes, K-C filed additional actions against FQ. These actions were either consolidated with the first suit filed in this court or voluntarily dismissed by K-C. The consolidated action culminated in a number of summary judgment motions, some granted and some denied. One such summary judgment ruling was that K-C's U.S. Patent No. 6,847,067 (the '067 patent), which described a disposable training pant with refastenable side seams, was invalid for obviousness. *See Kimberly-Clark Worldwide, Inc. v. First Quality Baby Products, LLC*, 900 F. Supp. 2d 903 (E.D. Wis. 2012). This court concluded that claims 8–10 of the '067 patent, claiming the refastenable side-seams, described an obvious combination of K-C's own non-refastenable Pull-Ups® training pant and a refastenable feature taught in the prior art. On May 31, 2013, the parties settled the remaining issues and agreed to entry of final judgment. K-C then appealed the court's adverse ruling on the '067 patent.

While that appeal was pending, on June 10, 2014, the PTO issued the '379 patent, and on July 11, 2014, K-C filed this action for infringement of that patent in the Western District of Wisconsin. The '379 patent is a continuation of several patents including the '067 patent (which itself was a continuation of a patent filed originally filed in 1999). Like the '067 patent, the '379 patent describes a disposable training pant with refastenable side seams. (ECF No. 1-1.) The '379 patent and the '067 patent share the same inventors, specification and drawings. According to K-C, the '379 patent is significantly different than the '067 patent because the former contains additional

substantive limitations, such as "containment flaps," a "surge layer" and other features. (ECF No. 71 at 17.) FQ, on the other hand, alleges that K-C used samples of FQ's training pants to draft claims for '379 patent in an attempt to cover FQ's product so that it could then sue FQ for infringement if and when its continuation patent was granted.

Meanwhile, in the Pennsylvania case, the district court entered an order on June 5, 2014 indicating the parties had reached a settlement. The parties executed a settlement agreement on August 21, 2014 wherein the parties acknowledged the June 5 order and agreed that within seven days of execution of the agreement, "the Parties agree to file an Agreed Order dismissing with prejudice all claims and counterclaims, and waiving all appeals, in the Pennsylvania Suit[.]" (Pls.' Ex. 54, ECF No. 103-2, § 6.4.) On August 26, 2014, the Pennsylvania court entered the dismissal order the parties had agreed to. It provided that pursuant to a settlement agreement, the parties jointly intended that the case be dismissed "with prejudice" and the court accordingly ordered that "[a]ll claims and counterclaims in the above-captioned action are hereby dismissed with prejudice." (Pls.' Ex. 13, ECF No. 71-15.)

The settlement agreement also contains a mutual release. The agreement provides that the parties "irrevocably, comprehensively and mutually release, acquit and forever discharge each other" from:

> (1) all claims and counterclaims that have been asserted or could have been asserted by one Party against the other, which claim or counterclaim pertains to the Patents-In-Suit and (2) all claims and counterclaims for past damages that have been asserted or could have been asserted by one Party against the other, which claim or counterclaim pertains to the following products if manufactured sold, imported, exported, offered for sale or otherwise transferred on or before the Effective Date: all protective underwear, belted undergarments, pant liners, bladder control pads, male guards, briefs, under pads, liners, baby diapers, youth pants, youth briefs and Accused Products (the foregoing list of products shall not be construed to include

4

infant or toddler training pants).

(ECF No. 103-2, § 5.1.)  The parties also agreed to other terms relating to the patents and products at issue, including that K-C would not sue FQ on the patents-in-suit alleging infringement by certain redesigned products and that K-C granted FQ immunity from suit for its future use of the accused products.  (*Id.* §§ 3.1, 4.1.)

Back in this case, FQ filed its answer on August 11, 2014.  It asserted affirmative defenses based on invalidity and the doctrine of unclean hands and asserted counterclaims for declaratory judgment of non-infringement and invalidity.  (ECF No. 19.)  On September 2, 2014, FQ filed an amended answer adding the defense of prosecution laches.  On October 10, 2014, the Federal Circuit affirmed this court's 2012 judgment of invalidity of the '067 patent without opinion in a per curiam judgment.  (ECF No. 43-1.)  Counsel for FQ then sent a letter to K-C's counsel stating the Federal Circuit's decision "leaves no doubt that the '379 Patent is also invalid . . . ."  (*See* 2d Am. Answer and Countercls. ¶ 84, ECF No. 62.)  FQ requested that K-C voluntarily dismiss the suit, but K-C did not respond.

On November 20, 2014, FQ's motion to transfer the case to this court from the Western District was granted.  (ECF No. 50.)  In an unopposed motion filed the next day, FQ requested leave to file an amended answer and counterclaim.  This court granted the motion November 23, 2014.  FQ's new pleading added its fifth affirmative defense asserting K-C's claim on the '379 patent is barred by collateral estoppel, as well as the antitrust counterclaims.  FQ alleges K-C's suit on the '379 suit is objectively baseless because the '379 patent is invalid and unenforceable.  (ECF No. 62, ¶ 87.)  In addition to the alleged "sham" suit on the '379 patent, FQ also alleges K-C has engaged in a pattern of litigation without regard for the merits of its claims but with the purpose of excluding

competition from private label companies like FQ, driving up costs for FQ and interfering with its business. (*Id.* ¶¶ 88–89.)

On December 16, 2014, K-C filed a motion to separate and stay the antitrust counterclaims and a motion for a protective order staying discovery related to the antitrust counterclaims until the disposition of the motion to separate and stay. The court granted the latter request. On December 23, 2014, K-C moved to dismiss the antitrust counterclaims and strike FQ's fifth affirmative defense of collateral estoppel. On January 16, 2015, FQ responded to the motion to dismiss and simultaneously moved for summary judgment in its favor as to the first ground for dismissal offered by K-C, which was that the antitrust counterclaims are precluded under the Pennsylvania court's dismissal of the prior antitrust counterclaims "with prejudice." These motions are now fully briefed.

## ANALYSIS

### A.     Res Judicata

K-C first argues that FQ's anti-trust claims are barred under the doctrine of res judicata by the final judgment entered in the Pennsylvania litigation. Res judicata, also called claim preclusion, is an affirmative defense. Fed.R.Civ.P. 8(c)(1). A pleading generally need not anticipate and avoid affirmative defenses. *Levin v. Miller*, 763 F.3d 667, 671 (7th Cir. 2014). Nevertheless, a suit may be dismissed if a valid affirmative defense is sufficiently obvious "from the face of the complaint [or counterclaim.]" *Walker v. Thompson*, 288 F.3d 1005, 1009–10 (7th Cir. 2002). Matters outside the pleadings may be considered on a motion to dismiss without converting it to one for summary judgment if the matters are properly subject to judicial notice. *Henson v. CSC Credit Servs.*, 29 F.3d 280, 284 (7th Cir. 1994).

6

Seventh Circuit law applies to the claim preclusion issues in this case. *Dana v. E.S. Original, Inc.*, 342 F.3d 1320, 1323 (Fed. Cir. 2003). According to the Seventh Circuit:

> The doctrine of claim preclusion is premised on the idea that, when a claim has been fully litigated and come to judgment on the merits, finality trumps. Claim preclusion under federal law has three ingredients: a final decision in the first suit; a dispute arising from the same transaction (identified by its "operative facts"); and the same litigants (directly or through privity of interest).

*Czarniecki v. City of Chicago*, 633 F.3d 545, 548 (7th Cir. 2011) (alteration in original) (citations omitted). "Res judicata also bars litigation of claims that 'could have been raised' in the previous litigation, but were not." *Maher v. F.D.I.C.*, 441 F.3d 522, 526 (7th Cir. 2006) (citation omitted).

K-C argues that FQ's antitrust counterclaims are precluded here because (1) all three "ingredients" above are present and (2) FQ could have raised all the requisite facts (including K-C's filing of this suit on the '379 patent in July 2014) prior to the August 2014 dismissal of the earlier antitrust counterclaims. K-C notes that a stipulated dismissal with prejudice was entered in the Pennsylvania litigation and that such a dismissal is a final judgment on the merits for claim preclusion purposes. (ECF No. 71 at 12) (citing *Lawler v. Nat'l Screen Serv. Corp.*, 349 U.S. 322, 327 (1995); *Golden v. Barenborg*, 53 F.3d 866, 867 (7th Cir. 1995). K-C also notes that FQ's antitrust claims arise out of the same operative facts that were, or could have been alleged in the Pennsylvania litigation, and that the parties in this case are either the same as, or in privity with, the parties in the Pennsylvania litigation. (ECF No. 71 at 12–14.) It therefore follows, K-C argues, that FQ's antitrust claims are barred.

FQ argues in response, however, that the judgment of dismissal of the Pennsylvania litigation was based on a written Settlement Agreement of the parties. As FQ notes, the Settlement Agreement is crucial. In determining the res judicata effect of an order of dismissal based upon a settlement

agreement, courts strive to give effect to the intent of the parties.  *Norfolk Southern Corp. v. Chevron, U.S.A., Inc.*, 371 F.3d 1285, 1289 (11th Cir. 2004).  "The best evidence of that intent is, of course, the settlement agreement itself."  *Id.*  Thus, the scope of the preclusive effect of a prior judgment of dismissal is determined not by the claims specified in the original complaint, but instead by the terms of the settlement agreement, as interpreted according to traditional principles of contract law.  *Id.*; *see also Arrow Gear Co. v. Downers Grove Sanitary Dist.*, 629 F.3d 633, 638 (7th Cir. 2010);  *Pactiv Corp. v. Dow Chem. Co.,* 449 F.3d 1227, 1230–1232 (Fed. Cir. 2006).  FQ argues that the terms of the Settlement Agreement demonstrate that K-C's argument for dismissal of its antitrust counterclaims on grounds of res judicata is without merit.  Even more, FQ argues that it is clear from the terms of the Settlement Agreement that the antitrust claims it has asserted here are preserved.  FQ therefore has therefore moved for summary judgment in its own favor on K-C's res judicata defense and asks that it be struck.

As noted above, under the terms of the Settlement Agreement, the parties released each other from all claims and counterclaims that pertain to the patents-in-suit in the Pennsylvania action and all claims and counterclaims for past damages that pertain to certain enumerated products, the list of which excludes infant or toddler training pants.  (ECF No. 103-2, § 5.1.)  The '379 patent was not one of the patents-in-suit in the Pennsylvania action, and it pertains to training pants, the product expressly excluded from the release.  Thus, by its plain terms, the Settlement Agreement would appear to except from the release the counterclaims FQ has asserted here.

K-C argues that FQ has omitted other language from the Settlement Agreement that makes clear the parties' intent to dismiss all claims and counterclaims in the Pennsylvania action with prejudice.  Specifically, § 6.4 of the Settlement Agreement states: "Within seven (7) calendar days

of execution of this Settlement Agreement, the Parties agree to file an Agreed Order dismissing with prejudice all claims and counterclaims, and waiving all appeals, in the Pennsylvania Suit, in the form attached as Exhibit G." (ECF No. 103-2.) K-C argues this language demonstrates that the final judgment in the Pennsylvania action was intended to resolve all disputes in that action, including the antitrust claims. (ECF No. 102-1 at 2.) K-C also accuses FQ of conflating two separate defenses – release and res judicata – by relying exclusively on the language of the release portion of the Settlement Agreement. K-C notes that it is not relying on the release or the Settlement Agreement as a bar to FQ's antitrust claims, but instead on the final order of dismissal with prejudice. Finally, K-C contends that in order to avoid the preclusive effect of a judgment through an agreement, the parties must do so by including an express reservation and waiver. K-C contends that the Settlement Agreement contains no such reservation or waiver. (Id. 2-3.)

K-C's arguments are not persuasive. The release on which FQ relies is part of the Settlement Agreement and sets forth the parties' specific understanding and intention as to effect of their Agreement. A limited release in a settlement agreement narrows the preclusive effect of a final judgment to those claims that are not expressly reserved. *Arrow Gear*, 629 F.3d at 638. The release here expressly excepts from its terms claims and counterclaims pertaining to other patents and infant or toddler training pants. This language controls over the more general statement of future intent quoted by K-C. Moreover, it makes no sense to create such an exception to the release unless the parties intended to avoid the preclusive effect of the dismissal of the Pennsylvania action on such claims. K-C apparently wanted to preserve its right to pursue its claim against FQ for infringement of the '067 patent in the event its appeal was successful. In doing so, K-C likewise preserved FQ's antitrust claim against K-C pertaining to the same product. It follows that FQ's claim is not barred.

9

FQ's motion for summary judgment on K-C's affirmative defense of res judicata will therefore be granted.

**B.    *Noerr-Pennington* Immunity and the Sham Litigation Exception**

Aside from res judicata, K-C argues the antitrust counterclaims must be dismissed because it is entitled to immunity for its patent litigation under *Eastern Railroad Presidents Conference v. Noerr Motor Freight, Inc.*, 365 U.S. 127 (1961) and *United Mine Workers of America v. Pennington*, 381 U.S. 657 (1965). So-called *Noerr-Pennington* immunity is premised on the notion that "[t]hose who petition the government for redress are generally immune from antitrust liability." *Professional Real Estate Investors, Inc. v. Columbia Pictures Industries, Inc.*, 508 U.S. 49, 56 (1993) (hereinafter "*PRE*"). The rule is particularly apt in patent cases since a patent, by definition, carves out an exception to the applicability of antitrust laws. "[A] patent is an exception to the general rule against monopolies and to the right to access to a free and open market." *Precision Instrument Mfg. Co. v. Automotive Maintenance Machinery Co.*, 324 U.S. 806, 816 (1945). It only stands to reason that a patent holder should not be subject to suit for taking advantage of the monopoly that the law expressly allows it.

There are exceptions to *Noerr-Pennington* immunity, however. Under *Walker Process Equipment, Inc. v. Food Machinery Corp*, for example, a patent holder who brings an infringement suit may be subject to antitrust liability for the anti-competitive effects of that suit if the asserted patent was obtained through knowing and willful fraud. 382 U.S. 172, 177 (1965). There is no such allegation here. FQ has not accused K-C of having obtained the '379 patent by willful fraud. Instead, FQ contends that the "sham" litigation exception to *Noerr* immunity applies.

10

In *PRE*, the Supreme Court held that *Noerr* immunity does not apply to allegedly anticompetitive "sham" litigation. The reason for this exception is that "application of the Sherman Act would be justified when petitioning activity, ostensibly directed toward influencing government action, is a mere sham to cover . . . an attempt to interfere directly with the business relationships of a competitor." *Id.* at 56 (quotations omitted). This exception applies in the patent context as well. A patent holder is not entitled to *Noerr-Pennington* immunity when a suit for patent infringement is a mere sham to cover an illegal attempt to eliminate or suppress competition. *Kaiser Foundation Health Plan, Inc. v. Abbott Laboratories, Inc.*, 552 F.3d 1033, 1045 (9th Cir. 2009).

There are two elements to sham litigation: "First, the lawsuit must be objectively baseless in the sense that no reasonable litigant could realistically expect success on the merits." *Id.* at 60. This standard is akin to the standard for probable cause. *Id.* at 62. Second, the baseless suit must "conceal[] an attempt to interfere *directly* with the business relationships of a competitor . . . through use [of] the government *process*—as opposed to the *outcome* of that process—as an anticompetitive weapon[.]" *Id.* at 60–61 (citations omitted and emphases in original). Put another way, a "sham" suit is not a "genuine" suit in either sense of the word because the asserted claim must be objectively baseless and the complainant must subjectively know it. *Id.* at 61.

In patent cases in which the sole or primary defense is a challenge to the validity of the patent, *Noerr-Pennngton* immunity will generally prevail. *See Tyco Healthcare Group LP v. Mutual Pharmaceutical Co., Inc.*, 762 F.3d 1338, 1345 (Fed. Cir. 2014) ("Given the presumption of patent validity and the burden on the patent challenger to prove invalidity by clear and convincing evidence, it will be a rare case in which a patentee's assertion of its patent in the face of a claim of invalidity will be so unreasonable as to support a claim that the patentee has engaged in sham litigation."). But

11

implicit in the Federal Circuit's statement that a finding of sham litigation will be rare in such circumstances is the acknowledgment that it is possible. In other words, the Federal Circuit has not ruled out the possibility that an action to enforce a facially valid patent in the face of a claim of invalidity can constitute sham litigation. FQ argues that this is such a rare case.

FQ notes that at the time K-C filed this action seeking to enforce its '379 patent, this court had already entered a judgment declaring the '067 patent, the parent of the '379 patent, invalid as obvious. The PTO had reached the same conclusion in an *inter partes* re-examination of the '067 patent on October 9, 2013, and rejected each and every claim of the patent as obvious. (ECF No 62, ¶¶ 67, 68.) In addition, the Federal Circuit summarily affirmed this court's determination that the '067 patent was invalid on October 10, 2014, three months after K-C filed its suit to enforce the '379 patent. FQ alleges that the '379 patent is "virtually identical" to the '067 patent except for the addition of several features well known in the prior art. Despite this fact and the Federal Circuit's decision summarily affirming this court's obviousness determination of the '067 patent, K-C has refused FQ's request that it voluntarily dismiss the current action.

It is not only this action, however, that FQ cites in support of its antitrust claims against K-C. Relying on *California Motor Transport Co. v. Trucking Unlimited*, 404 U.S. 508, 513 (1972), FQ alleges that K-C has filed "a pattern of baseless, repetitive claims" against FQ sufficient to support a finding that K-C has abused the administrative and judicial processes in an effort to interfere with FQ's lawful efforts to compete in the disposable training pant market. In support of this allegation, FQ recites in its counterclaim the history of K-C's three previous lawsuits against FQ in this court in which K-C sued FQ for infringement of twelve separate patents relating to disposable training pants or their manufacture. In 2009 K-C sued FQ for infringement of two of its patents on the

12

training pant product, including the '067 patent, and sought an injunction enjoining FQ from manufacturing and selling its training pant product. After the court denied K-C's motion for a preliminary injunction, K-C filed an amended complaint in which it accused FQ of infringing several other K-C patents covering its manufacturing process for disposable training pants. K-C again sought a preliminary injunction to enjoin FQ from manufacturing its training pants product in violation of K-C's patents. Although this court granted K-C's motion as to four of its process patents, the Federal Circuit reversed as to three on the ground that FQ had raised substantial questions as to their validity. In the meantime, FQ had redesigned its manufacturing process so as not to infringe K-C's patents. K-C then filed a third motion for preliminary injunction, which the court ultimately denied as moot.

While its previous action was still pending, K-C filed two additional lawsuits in this court against FQ for infringement of two other process patents. In one, the court found the patent invalid. In the other, K-C voluntarily dismissed the action after FQ brought to its attention prior art not considered by the PTO. As summarized by FQ, of the twelve patents K-C asserted against it, four were invalidated, two were found not infringed, five (including three with substantial questions of validity) were designed around, and one was voluntarily dismissed. (ECF No. 62, ¶¶61-74.) The amount of and lack of success in its previous litigation in this court, FQ contends, supports an "inference of a pattern of predatory litigation under *California Motor Transport*" by K-C. (ECF No. 80 at 19.)

FQ further contends that K-C manipulated the patent process in order "to manufacture still more sham litigation with First Quality on the '379 Patent." (*Id.* at 20.) In support of this allegation, FQ notes that shortly after being sued by K-C for infringement of the 067 patent, and prior to the

13

court's determination that it was invalid, it redesigned its training pant product in an effort to resolve the dispute between the parties. FQ states that it provided K-C samples of its redesigned product to K-C and asked K-C to confirm that it no longer infringed. FQ alleges that instead of confirming the fact that its modified design no longer infringed K-C's '067 patent, K-C drafted new claims for the '379 patent to cover FQ's new design. FQ alleges that this is reflective of how K-C has exploited the patent process so as to maintain its dominant share of the disposable training pant market:

> After first applying for a patent relating to refastenable training pants in 1998, K-C has repeatedly filed "continuation" applications with the Patent Office for the purpose of broadening claims and even adding new claims altogether. Through careful maneuvering in the Patent Office, K-C has ensured that for the past fifteen years, it has always had at least one patent application pending relating to refastenable training pants. This has allowed K-C to add or amend claims relating to training pants whenever doing so tactically suited its interests. In this way, K-C has exploited "continuation" practice by, for example, introducing minor, trivial differences over the prior art into patent claims when K-C was threatened with a validity challenge.

(ECF No. 62 ¶ 77.) FQ further alleges that "the Patent Office twice rejected as obvious every claim of the application that would become the '379 Patent," explaining "how each element of the claims was either taught in the prior art or involved obvious modifications in view of the prior art." (*Id.* ¶ 79.) Despite K-C's failure to adequately address the issues raised in the prior rejections, FQ alleges that the PTO "finally relented under the procedural onslaught from K-C and, without any explanation, finally allowed the claims and the patent to issue." (*Id.*)

FQ also alleges that the claims of the '379 patent are unenforceable under the doctrine of prosecution laches. According to FQ, K-C waited more than a decade before adding the claims it alleges FQ infringed to its continuation patent, and only after observing FQ's product. FQ alleges that if the '379 patent is enforceable, K-C's delay will have inflicted substantial harm upon FQ in the form of reliance costs. FQ alleges that it "has invested in manufacturing materials and equipment

designed to make training pants with non-elasticized and non-stretched front side panels and has sold those products for years under the reasonable understanding that such products avoided the claims of the patents in the '067 Patent family." (Id. at ¶ 81.) Given this delay, FQ alleges that K-C knew or should have known that the claims of the '379 patent are unenforceable and for this reason as well its lawsuit constitutes sham litigation.

Finally, FQ alleges that the training pant market is particularly conducive to this sort of anticompetitive sham litigation because K-C, with some 75% of the training pant market, has much lower "per-unit" litigation costs than competitors like FQ with much smaller market shares. (*Id.* ¶¶ 53–55.) In such a market, FQ contends, the prospect of earning monopoly profits from the exclusion of a competitor makes sham litigation more profitable and likely. (ECF No. 80 at 15.) Based on these allegations, FQ contends that it has set forth a plausible account of antitrust claims from which K-C is not immune as a matter of law.

K-C argues these allegations are insufficient under *PRE* to strip a litigant of *Noerr-Pennington* immunity. K-C relies heavily on the presumption that duly issued patents are valid and that a patentee who exercises the right to assert a facially valid patent against a competitor, absent an allegation that it was obtained by fraud, does so in good faith and is immune from liability on antitrust claims. K-C's position is not without merit. As noted above, a patent holder should not be subject to antitrust liability for attempting to take advantage of the very rights that the patent affords him or her. Moreover, given the presumption of validity that attends a lawfully granted patent, it is difficult to see how attempting to enforce it against the manufacturer of an infringing product can be considered "objectively baseless." The PTO is an independent governmental body that is mandated to issue only patents for inventions that are novel and not obvious. 35 U.S.C. §§ 102, 103; *see also*

*Structural Rubber Prods. Co. v. Park Rubber Co.*, 749 F.2d 707, 714 (Fed.Cir.1984) (explaining that the statutory presumption of patent validity carries with it, inter alia, a presumption of nonobviousness). The very fact that the '379 patent was issued would therefore seem to preclude a finding that K-C's action to enforce it against an infringing product is baseless.

FQ emphasizes the fact that this court found the '067 patent invalid and its decision was summarily affirmed by the Federal Circuit. In FQ's view, the '379 patent is virtually the same as the '067 patent, and thus K-C's refusal to dismiss its suit after the Federal Circuit affirmed this court's invalidity determination is a clear indication its claim is baseless. But as K-C points out, the '379 patent is a different patent; it has different claims. Moreover, the patent examiner who granted the application for the '379 patent had before him this court's decision invalidating the '067 patent and all of the prior art on which the court relied. This fact makes the presumption of validity even stronger. *See Tokai Corp. v. Easton Enterprises, Inc.*, 632 F.3d 1358, 1367 (Fed. Cir. 2011) (noting that "a party challenging validity shoulders an enhanced burden if the invalidity argument relies on the same prior art considered during examination by the U.S. Patent and Trademark Office").

K-C also challenges FQ's characterization of its prior litigation in this court as evidence of a pattern of predatory litigation within the meaning of *California Motor Transport*. K-C first notes that *California Motor Transport*, which the Ninth Circuit reaffirmed in *USS-POSCO Industries v. Contra Costa County Bldg. & Const. Trades Council, AFL-CIO*, 31 F.3d 800 (9th Cir. 1994), has not been adopted by either the Federal Circuit or the Seventh Circuit. Thus, the suggestion in those cases that the number of lawsuits brought by a party can amount to sham litigation, even if all or some have merit, has no application here. Even if *California Motor Transport* did apply, K-C argues that its history of litigation in this court to enforce its patents was in good faith and does not meet

that standard.

I agree that K-C is immune from liability for its previous lawsuits against FQ. K-C sought to enforce against FQ twelve separate patents that it expended substantial time, money and effort to obtain with varying degrees of success. This was not a series of unsuccessful lawsuits that were brought with no hope of success, but in essence one primary case with two small branches. The fact that K-C has adopted a business model of obtaining patents for its products and the processes it has developed to manufacture them, and then seeks to enforce them to the full extent permitted by law, is not a reason to subject it to the penalties allowed for antitrust violations:

> Neither the bringing of an unsuccessful suit to enforce patent rights, nor the effort to enforce a patent that falls to invalidity, subjects the suitor to antitrust liability. *Cf. Concrete Unltd. Inc. v. Cementcraft, Inc.*, 776 F.2d 1537, 1539, 227 USPQ 784, 785 (Fed.Cir. 1985) (no liability for unfair competition based on suit to enforce an invalid patent). Since a principal purpose of the patent system is to provide innovators with a property right upon which investment and other commercial commitments can be made, absent the *PRE* criteria the patentee must have the right of enforcement of a duly granted patent, unencumbered by punitive consequences should the patent's validity or infringement not survive litigation. *See id.* The law recognizes a presumption that the assertion of a duly granted patent is made in good faith, *see Virtue v. Creamery Package Mfg. Co.*, 227 U.S. 8, 37–38 (1913); this presumption is overcome only by affirmative evidence of bad faith. *See PRE, supra*.

*C.R. Bard, Inc. v. M3 Systems, Inc.*, 157 F.3d 1340, 1369 (Fed. Cir. 1998).

In essence, FQ's argument is that the patents K-C attempted to enforce in the previous lawsuit should never have been issued. But absent an allegation of fraud or inequitable conduct on the part of K-C in obtaining its patents, this is a complaint against the PTO more than K-C. K-C invested substantial time and money to design a refastenable disposable training pant product and the machines needed to mass produce that product. It also invested substantial resources in creating a market for it. K-C then expended much time and money to apply for and obtain patents on its

17

product and manufacturing processes in order to protect its investment. K-C should not be punished because the PTO issues "bad" patents. *See Microsoft Corp. v. i4i Ltd. Partnership*, 131 S.Ct. 2238, 2251-52 (2011). FQ's argument is for reform of the PTO, not for imposing antitrust liability on K-C.

At least at this point, however, I will deny K-C's motion as to the current litigation. The fact that K-C commenced this action, even though the parent to the '379 patent was found invalid by the court, and has continued the action even after the Federal Circuit affirmed that determination seems to distinguish this case from others in which *Noerr-Pennington* immunity has been applied. FQ cites several district court cases in which Rule 12(b)(6) motions have been denied under such circumstances. *See, e.g., In re Skelaxin Metaxalone Antitrust Litig.*, 2013 U.S. Dist. LEXIS 70968, at **63–64 (E.D. Tenn. May 20, 2013) (allegations that infringement claims on continuation patent were sham under PRE were made plausible by the defendant's knowledge of the invalidity of the parent); *Teva Pharmaceutical Indus., Ltd. v. Apotex, Inc.*, 2008 WL 3413862, at **6–7 (D.N.J. Aug. 8, 2008) (allegations that infringement claims on a continuation patent were a sham under *PRE* were made plausible by allegations that defendant knew the parent patent would have been unenforceable). While it is true that the fact that the parent patent is invalid does not necessarily doom a descendent, FQ alleges that the claims K-C added in the '379 pertain to features well known in the prior art. FQ also alleges that the PTO twice rejected those claims but finally "relented" in allowing the claims without providing any explanation and even though K-C failed to adequately address the issues the examiner had raised. (ECF No. 62 ¶ 79.)

Also pertinent is FQ's allegation that K-C adopted a practice of filing continuation patents so that it could broaden claims and add new claims to protect its monopoly. More specifically, FQ alleges that in this case K-C misused the patent process by amending the claims of the '379 patent

18

to cover FQ's redesigned training pant product after FQ requested K-C to confirm that it did not infringe the '067 patent. As K-C observes, the Federal Circuit has explicitly approved the practice of expanding claims in order to obtain a right to exclude a competitor's product that a patentee observes in the marketplace. *Kingsdown Medical Consultants, Ltd. v. Hollister Inc.*, 863 F.2d 867, 874 (Fed. Cir. 1988). Here, however, FQ alleges that K-C was shown FQ's design in the course of litigation in an effort to resolve the case and that K-C delayed expanding its claims while FQ invested in manufacturing materials and equipment with the understanding that its product did not infringe K-C's patents. It is not clear that *Kingsdown* applies under these circumstances. *See Rambus v. Infineon Techs. AG*, 330 F. Supp.2d 679 (E.D. Va. 2004); *Kothmann Enterprises, Inc. v. Trinity Industries, Inc.*, 455 F.Supp.2d 608, 640 (S.D. Tex. 2006)..

Based on these allegations, I cannot say that this is not one of those rare cases in which the PTO's issuance of the patent is insufficient to overcome a claim that the patentee has engaged in sham litigation. Moreover, unlike the patents asserted in the earlier lawsuits, this court has not yet ruled on the validity of the '379 patent. FQ has filed a motion for summary judgment on that issue, and it seems prudent to address the merits of FQ's invalidity defense before deciding whether K-C's lawsuit to enforce it constitutes "sham" litigation. Accordingly, K-C's motion will be denied pending the court's decision of FQ's motion for summary judgment on validity of the '379 patent. The court will reconsider the motion upon deciding that motion.

## C.    Compulsory Counterclaims

K-C also moves to dismiss the antitrust counterclaims under Rule 13(a), which requires "[a] pleading *must* state as a counterclaims any claim that—at the time of its service—the pleader has against an opposing party if the claim . . . arises out of the transaction or occurrence that is the

19

subject matter of the opposing party's claim[] and . . . does not require adding another party over whom the court cannot acquire jurisdiction." Fed.R.Civ.P. 13(a)(1) (emphasis added). K-C contends that FQ "had every opportunity" and knowledge all requisite facts to raise these claims in its initial answer, which was filed on August 11, 2014. (Pls.' Br. 28–29, ECF No. 71.)

But failure to raise a counterclaim covered by Rule 13(a) generally prevents a party from raising that counterclaim in a subsequent action, not necessarily later in the same action. *See* 6 CHARLES ALAN WRIGHT ET AL., FED. PRAC. & PROC. § 1417 (3d ed. 2010) ("A failure to plead a compulsory counterclaim bars a party from bringing a later independent action on that claim."). A defendant can, as FQ did here, fail to raise a counterclaim in the answer and nonetheless seek to amend and add counterclaims. *E.g.*, *United Central Bank v. Maple Court LLC*, No. 10-CV-464, 2010 WL 5345570, at *1 (E.D. Wis. Dec. 21, 2010) ("[D]efendants moved for leave to add counterclaims. Plaintiff opposes the motion. It argues that defendants waived their counterclaims, apparently believing that compulsory counterclaims under Fed.R.Civ.P. 13(a) must be exclusively pled in the original answer or be forever barred. This is incorrect. Defendants may request leave to amend their answer just as plaintiffs may request leave to amend their complaint."). Indeed, the fact that a counterclaim is "compulsory" is a reason for granting leave to amend, since if amendment is not allowed the counterclaim will be barred in subsequent actions. *See, e.g.*, *Jupiter Aluminum Corp. v. The Home Ins. Co.*, 181 F.R.D. 605, 609 (N.D. Ill. 1998) ("The argument for amendment is especially compelling where the claim is compulsory.").

K-C changes its tune slightly in its reply brief and argues FQ "has not and cannot show good cause" to amend its pleading, which was filed after the deadline for amended pleadings. (Reply at 30, ECF No. 102-1) (citing Rule 16(b)). But this argument is not only untimely in a reply brief, it

should have been presented when FQ filed its motion for leave to amend its pleading several months ago. Instead, FQ filed a motion to amend and a brief in support, which K-C did not oppose, and the court granted the motion. I decline to revisit that decision, particularly given that K-C does not appear to be prejudiced by the delay. I also note that according to K-C, the antitrust counterclaims here are the same as those pending in the Pennsylvania action when FQ answered on August 11, 2014, and therefore the present counterclaims would appear to be expressly excepted from the mandate of Rule 13(a). *See* Fed.R.Civ.P. 13(a)(2) ("The pleader need not state the claim if: (A) when the action was commenced, the claim was the subject of another pending action[.]"). For all of these reasons, I will not dismiss the antitrust counterclaims on the ground that FQ waived them in its initial answer.

## D.    FQ's Fifth Affirmative Defense

K-C has also moved under Rule 12(f) to strike FQ's fifth affirmative defense that this suit is barred "in whole or in part" by collateral estoppel under the Federal Circuit's decision. K-C argues that the judgment on the '067 patent does not preclude it from litigating the '379 claim.

Rule 12(f) permits the court to "strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." Courts generally apply the *Twombly-Iqbal* standard for determining whether an affirmative defense is sufficiently pled. *E.g.*, *S.E.C. v. Sachdeva*, No. 10-C-747, 2011 WL 933967, at *1 (E.D. Wis. Mar. 16, 2011). Collateral estoppel, also known as issue preclusion, "protects a party from having to litigate issues that have been fully and fairly tried in a previous action and adversely resolved against a party-opponent." *Ohio Willow Wood Co. v. Alps South, LLC*, 735 F.3d 1333, 1342 (Fed. Cir. 2013).

K-C's motion is based on the notion that FQ's collateral estoppel defense "makes no sense" given that the '067 and '379 patents are different patents. It is possible that collateral estoppel applies to different patents, however. *See, e.g.*, *Ohio Willow*, 735 F.3d at 1342 ("If the differences between the unadjudicated patent claims and adjudicated patent claims do not materially alter the question of invalidity, collateral estoppel applies."). Thus, given the similarity in the patents, I do not find that FQ's fifth affirmative defense was insufficiently pled. K-C's argument really goes to the merits (or lack thereof, in K-C's view) of FQ's defense, which the court will take up in resolving the coming summary judgment motion. Because the defense is plausible on its face, K-C's motion to strike will be denied.

### E.    Motion to Separate and Stay

K-C also moved, in the event its motion to dismiss is denied, to separate and stay the antitrust counterclaims until disposition of the underlying patent dispute. Rule 42(b) of the Federal Rules of Civil Procedure provides:

> For convenience, to avoid prejudice, or to expedite and economize, the court may order a separate trial of one or more separate issues, claims, crossclaims, counterclaims, or third-party claims. . . .

Additionally, the court may sequence discovery "for the parties' and witnesses' convenience and in the interests of justice[.]" Fed.R.Civ.P. 26(d)(2).

Given the interests at play in the context of antitrust counterclaims in a patent suit, K-C argues bifurcation has become the "standard practice." *In re Innotron Diagnostics*, 800 F.2d 1077, 1084 (Fed. Cir. 1986) ("The district court noted cases reflecting the now-standard practice of separating for trial patent issues and those raised in an antitrust counterclaim. Abbot has cited twenty-three of those cases from eight regional circuits."). Conversely, FQ urges the court to follow

the "commonsense principle" that claims with overlapping issues should be litigated together. Both sides have a point. Ultimately, while the burden is on the party seeking bifurcation, it is a decision committed to the discretion of the court. *Krocka v. City of Chicago*, 203 F.3d 507, 516 (7th Cir. 2000). It is also a case-specific determination that does not lend itself to general rules.

K-C argues the "standard practice" should be followed here because doing so would serve judicial economy, considering that the validity of the '379 patent is a logical predicate to the antitrust counterclaims. K-C argues a stay would also ensure that the notoriously costly antitrust discovery that would be required to litigate the antitrust counterclaims would be necessary, and a stay would permit the trier of fact to determine the several issues in this case in a sensible, ordered manner.

Noting that it has pled a *pattern* of predatory litigation on training pant patents, FQ downplays the significance of the validity of the '379 patent for the antitrust counterclaims. The issue regarding the pattern, FQ says, is whether the suits are brought without regard for their merit and instead for the purpose of injuring a market rival. Also, according to FQ, the antitrust issues would not be meaningfully narrowed even if K-C won on the '379 claim. I am not persuaded. First, FQ did not even assert the antitrust counterclaims until the Federal Circuit affirmed my ruling on the obviousness of the '067 patent. That alone indicates the validity of the patent-in-suit here, the continuation of the '067 patent, is a critical logical predicate to FQ's antitrust theory. More importantly, the court has already rejected FQ's pattern of litigation claim under based on its previous Wisconsin litigation. The entire focus for FQ's antitrust claims therefore must rest on the validity of the '379 patent.

FQ also argues that the issues raised by the '379 claim and FQ's defenses, including obviousness, unclean hands and unreasonable delay, are inextricably linked with the issues raised by

the antitrust counterclaims. This was not the case, FQ contends, with many of the cases K-C cites as demonstrating the "standard practice." FQ also argues the standard practice pertains to bifurcation of trials, not the whole case, including discovery. FQ asserts that here, discovery will overlap—for example, "the admissions of K-C's executive Robert Thibault before this Court in support of K-C's motion for a preliminary injunction on the invalid '067 patent as evidence of lost profits from First Quality's alleged infringement are *also* evidence of K-C's monopoly power and the consumer harm from K-C's sham litigation[.]" (Opp. at 14, ECF No. 72) (emphasis in original). FQ promises these overlapping issues will breed discovery disputes about the scope of allowed discovery versus stayed discovery.

These are legitimate concerns. Nonetheless, for two reasons, I believe expediency and judicial economy favor bifurcation: First, it is axiomatic that antitrust claims add significant discovery costs. Therefore, to the extent that the validity of the patent-in-suit is a logical predicate to the antitrust counterclaims, the patent suit should be resolved first. Second, although there is undoubtedly some overlap between the antitrust issues and issues in the patent suit, the patent case is still a relatively simple one. The patent issues (which are necessarily the common ones) will be decided in fairly short order—FQ's summary judgment as to invalidity is pending; the December trial date is set. Additionally, as the Pennsylvania district court reasoned in bifurcating the previous case, "resolution of the patent disputes would become the law of the case, and thus eliminate or reduce some of the proof that would be necessary at trial on the counterclaims." (ECF No. 78-2 at 3.)

FQ also asserts that a stay will prejudice it and consumers by prolonging K-C's allegedly unlawful monopoly. The argument presumes FQ's antitrust counterclaims are meritorious, of course, and to the extent they are and delay causes harm to FQ, the injury would appear to be accounted for

24

in its recovery in the antitrust case. Moreover, quick resolution of the infringement action will alleviate any further harm FQ will suffer.

## ORDER

K-C's motion to dismiss and strike (ECF No. 70) is denied in part. K-C's motion to separate and stay the antitrust counterclaims (ECF No. 65) is granted. FQ's motion for summary judgment (ECF No. 84) is granted. FQ's motion for leave to file (ECF No. 107) is also granted and the Clerk is directed to file the memorandum attached to the motion.

**SO ORDERED** this __9th__ day of April, 2015.

s/ William C. Griesbach
William C. Griesbach, Chief Judge
United States District Court