UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

---

KIMBERLY-CLARK WORLDWIDE INC. et al.,

        Plaintiffs,

  v.                                          Case No. 14-CV-1466

FIRST QUALITY BABY PRODUCTS LLC et al.,

        Defendants.

---

FIRST QUALITY BABY PRODUCTS LLC et al.,

        Counterclaim-Plaintiffs,

  v.

KIMBERLY-CLARK WORLDWIDE INC. et al.,

        Counterclaim-Defendants.

---

## DECISION AND ORDER

---

This case is before the Court on FQ's motion to reconsider the dismissal of its counterclaim alleging K-C engaged in a "pattern of predatory litigation" against FQ in violation of federal and state antitrust laws, and on K-C's motion to dismiss each of FQ's amended counterclaims except that alleging "sham litigation" based on the assertion of the only patent-in-suit in this case, U.S. Patent No. 8,747,379 (the '379 patent). This Court's previous decisions denying K-C's motion to dismiss the sham claim based on the '379 patent and granting FQ's motion for summary judgment that the asserted claims of the '379 patent are invalid are not subject to any request for reconsideration.

For the reasons below, FQ's motion for reconsideration will be denied, K-C's motion to dismiss will be granted, and the case will be set for further proceeding on FQ's counterclaim alleging sham litigation based on the '379 patent.

**BACKGROUND**

K-C filed this suit against FQ in 2014 alleging infringement of the '379 patent, which was issued by the U.S. Patent and Trademark Office (PTO) on June 10, 2014 from Application No. 12/692,103 (the '103 Application). The '103 Application was filed on January 22, 2010 as a continuation of several previous applications including one that issued as U.S. Patent No. 6, 849,067 (the '067 patent). This line of patents owned by K-C is directed to children's training pants with refastenable side seams and the patents claim priority to a provisional application filed on December 18, 1998.

K-C asserted the '067 patent against FQ in a prior case in this Court. No. 09-cv-916. In 2012, I granted FQ's motion for summary judgment that the asserted claims in the '067 patent were invalid as obvious based on analysis of K-C's original (1989) Pull-Ups® brand training pants, which were not refastenable, in view of a 1986 patent to LaFleur that disclosed a disposable training pant with Velcro® fastening strips. *Kimberly-Clark Worldwide, Inc. v. First Quality Baby Products, LLC*, 900 F. Supp. 2d 903, 909 (E.D. Wis. 2012). Judgment of invalidity was entered and affirmed by the Federal Circuit on October 10, 2014. ECF No. 43-1.

In this case, I granted FQ's motion for summary judgment that the asserted claims in the '379 patent are invalid under collateral estoppel arising from the Federal Circuit's affirmance, and invalid as obvious in the first instance for reasons similar to the reasons that the claims in the '067 patent were held invalid as obvious. ECF No. 217. In short, I concluded that the asserted claims of the '379 patent include nothing more than the combination of features that were deemed obvious

in the '067 patent case as well as other features that were well-known in the prior art, including in K-C's 1996 version of its non-refastenable Pull-Ups®. In other words, I concluded there was nothing patentably significant about the differences between the invalidated claims of the '067 patent and the asserted claims of the '379 patent.

With the underlying patent case concluded, the proceedings here turn to FQ's counterclaims, which were previously stayed. These include: monopolization of the disposable training pant market in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2, and the Wisconsin Antitrust Act, Wis. Stat. § 133.01 et seq.; unfair and deceptive acts and practices in violation of Wis. Stat. § 100.20 et seq.; and "breach of the duty of good faith and candor to the PTO." Am. Ccl. ¶¶ 120–143, ECF No. 232.

In support of these claims, FQ alleges K-C asserted the '379 patent against FQ in this case despite knowing the asserted claims of the '379 patent were invalid—more specifically, that K-C unreasonably refused to withdraw its suit on the '379 patent after the Federal Circuit affirmed this Court's judgment that the very similar asserted claims of the '067 patent were invalid. FQ also alleges K-C procured the '379 patent by fraud on the PTO during prosecution of the '103 Application. FQ's fraud theory alleges K-C's attorneys (1) withheld material prior art, namely, K-C's 1996 Pull-Ups®; (2) "concealed" this Court's summary judgment decision in the '067 patent case, which issued while the '103 Application was pending; (3) withheld from the '103 Application Examiner another PTO Examiner's rejections of the claims in the '067 patent issued during reexamination proceedings of the '067 patent; and (4) made misleading statements to the Examiner of the '103 Application in several ways. In short, FQ's fraud theory is that K-C's attorneys deceived the Examiner into believing the claims in the '103 Application were patentable, when in fact K-C knew they were not. It should be noted, however, as explained more below, that K-C provided and

3

the Examiner considered this Court's summary judgment decision in the '067 patent case, and further that the Federal Circuit's affirmance of that decision was not issued until well after the Examiner finally allowed the '379 patent to issue.

FQ also alleges K-C has asserted objectively baseless claims of patent infringement against FQ based on two other patents asserted in the 2009 '067 patent case, the '751 and the '119 patents, and that K-C has engaged in a broader unlawful pattern of anticompetitive litigation against FQ brought with or without probable cause, without regard for the merits of the claims, and primarily to interfere with the business of FQ. Finally, FQ alleges K-C engaged in inequitable conduct in relation to two other patents, the '378 and '316 patents, and that K-C continues to this day to prosecute a continuation application with claims that are indistinct from the invalidated claims of the '067 and '379 patents.

## ANALYSIS

K-C moves to dismiss all of the above counterclaims with the exception of FQ's claim that K-C continued to assert the '379 patent against FQ despite knowing the asserted claims were invalid. Generally, the law presumes the assertion of a duly granted patent is made in good faith and the patent holder is immune from antitrust liability for asserting its patent against an alleged infringer. An exception to that immunity exists for so-called "sham litigation," which requires showing that the litigation is "objectively baseless" in the sense that no reasonable litigant could realistically expect success on the merits and that the litigation is "subjectively baseless" meaning brought with intent to interfere directly with the business relationships of a competitor through the use of the litigation process rather than with intent to win the relief sought through that process. *Professional Real Estate Investors, Inc. v. Columbia Pictures Industries, Inc.*, 508 U.S. 49, 60–61 (1993). This Court previously denied K-C's motion to dismiss FQ's sham claim based on the '379

4

patent, reasoning FQ's allegations were sufficient to overcome the presumption of validity for pleading purposes given the similarity of the asserted claims to the invalidated claims in the '067 patent and given that the Federal Circuit had affirmed the invalidity of the '067 patent and that K-C nonetheless refused to withdraw its suit on the '379 patent. ECF No. 128 at 18. That claim is not currently before me.

What is before me is FQ's request that I reconsider my decision denying FQ's pattern of litigation claim against K-C and K-C's motion to dismiss FQ's counterclaims.

## I. RECONSIDERATION OF PATTERN CLAIM

Reconsideration is allowed under Rule 54(b) any time before final judgment and is appropriate "to correct manifest errors of law or to present newly discovered evidence." *Rothwell Cotton Co. v. Rosenthal & Co.*, 827 F.2d 246, 251 (7th Cir. 1987). "Reconsideration is not an appropriate forum for rehashing previously rejected arguments or arguing matters that could have been heard during the pendency of the previous motion." *Caisse Nationale de Credit Agricole v. CBI Industries, Inc.*, 90 F.3d 1264, 1270 (7th Cir. 1996).

FQ argues dismissal of the pattern claim was improper under the Supreme Court's decision in *California Motor Transport Co. v. Trucking Unlimited*, 404 U.S. 508 (1972). FQ notes that the Court's discussion of Ninth Circuit's decision in *California Motor Transport* seemed to ignore the fact that the Supreme Court affirmed its decision. April 9, 2015 Decision at 16, ECF No. 128. Failing to follow Supreme Court precedent would constitute a manifest error of law.

Of course, this court is bound by decisions of the Supreme Court regardless of what other lower courts have held. What I intended to convey was not that the Supreme Court's decision in *California Motor Transport* is not the law of the land, but that the case does not support FQ's argument that K-C's history of seeking to enforce its facially valid patents constitutes a "pattern-of-

5

of-litigation" antitrust claim. *California Motor Transport* was not a patent case. There the defendant trucking companies were alleged to have pooled their resources to obstruct and oppose all applications filed by their competitors for operating rights on the California highways "with or without probable cause, and regardless of its merits; and that in every case defendants would pursue their opposition through all stages of administrative and judicial review. Defendants told their competitors that they could avoid the expense and delay resulting from defendants' opposition only by abandoning pending applications and severely limiting or refraining entirely from filing further applications." 432 F.2d 755, 762 (9th Cir. 1970).

In affirming the Ninth Circuit's decision reversing the dismissal of the complaint, the Supreme Court noted that the plaintiffs had alleged more than an intent to obtain a monopoly:

> More critical are other allegations, which are too lengthy to quote, and which elaborate on the 'sham' theory by stating that the power, strategy, and resources of the petitioners were used to harass and deter respondents in their use of administrative and judicial proceedings so as to deny them 'free and unlimited access' to those tribunals. The result, it is alleged, was that the machinery of the agencies and the courts was effectively closed to respondents, and petitioners indeed became 'the regulators of the grants of rights, transfers and registrations' to respondents—thereby depleting and diminishing the value of the businesses of respondents and aggrandizing petitioners' economic and monopoly power.

404 U.S. at 511. The Court also emphasized the fact that the defendants were alleged to have "'instituted the proceedings and actions . . . with or without probable cause, and regardless of the merits of the cases.'" *Id.* at 512.

While FQ argues that *California Motor Transport* supports its claim that K-C engaged in unlawful anti-competitive conduct by bringing multiple lawsuits to enforce its lawfully issued patents, neither the Seventh Circuit, nor the Federal Circuit, nor the Supreme Court, for that matter, have held that a series of non-frivolous lawsuits for patent infringement can constitute a restraint of trade claim under the nations anti-trust laws. Even under *California Motor Transport*, more was

6

required. The Supreme Court's more recent decision in *FTC v. Actavis, Inc.*, --- U.S. ---, 133 S. Ct. 2223 (2013), is not to the contrary. Thus, though poorly explained, the court's conclusion in its original decision that FQ failed to state a claim against K-C based on its pattern of litigation remains sound. FQ's motion for reconsideration will therefore be denied.

## II. FRAUD CLAIM

K-C moves to dismiss the counterclaim alleging fraud on the PTO for a number of reasons. To survive a motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure, a claim must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Partly because fraud is such a serious allegation, however, claims alleging fraud, including fraud on the PTO, must be pled "with particularity." Fed. R. Civ. P. 9(b); *Exergen Corp. v. Wal-Mart Stores, Inc.*, 427 F.3d 1312, 1327 (Fed. Cir. 2009).

Like a patent holder who conducts "sham litigation," a patent holder who asserts a patent that was procured by fraud on the PTO is not entitled to immunity from antitrust liability. *See Walker Process Equipment, Inc. v. Food Machinery & Chemical Corp.*, 382 U.S. 172 (1965). A claim of fraud on the PTO or "inequitable conduct" during prosecution of a patent application before the PTO requires proving "the patentee acted with the specific intent to deceive the PTO." *Therasense, Inc. v. Becton, Dickinson & Co.*, 649 F.3d 1276, 1290 (Fed. Cir. 2011) (en banc). "In a case involving nondisclosure of information, clear and convincing evidence must show that the applicant made a deliberate decision to withhold a known material reference." *Id.* (quoting *Molins PLC v. Textron, Inc.*, 48 F.3d 1172, 1181 (Fed. Cir. 1995)). Put another way, "a pleading of inequitable conduct under Rule 9(b) must include sufficient allegations of underlying facts from which a court may reasonably infer that a specific individual (1) knew of the withheld material

7

information or of the falsity of the material misrepresentation, and (2) withheld or misrepresented this information with a specific intent to deceive the PTO." *Exergen*, 575 F.3d at 1328–29 (emphasis added).

Moreover, although malice, intent, knowledge, and other conditions of a person's mind may be alleged generally under Rule 9(b), the facts pled must plausibly give rise to the inference of a fraudulent intent. In fact, to sustain a claim of fraud on the PTO, "the specific intent to deceive must be the single most reasonable inference able to be drawn from the evidence." *Therasense*, 649 F.3d at 1290 (emphasis added); *Exergen*, 575 F.3d at 1329 n.5 (quoting *Star Scientific, Inc. v. R.J. Reynolds Tobacco Co.*, 537 F.3d 1357, 1366 (Fed. Cir. 2008)). This is purposely a difficult standard to meet. "While honesty at the PTO is essential," the full Federal Circuit reasoned in *Therasense*, "low standards for intent and materiality have inadvertently led to many unintended consequences, among them, increased adjudication cost and complexity, reduced likelihood of settlement, burdened courts, strained PTO resources, increased PTO backlog, and impaired patent quality." 649 F.3d at 1290. The court thus disavowed previous indications that inequitable conduct could be shown where the patent applicant failed to disclose prior art he knew or should have known was material, and instead "tighten[ed] the standards for finding both intent and materiality in order to redirect a doctrine that has been overused to the detriment of the public." *Id.*

Here, I cannot infer from the facts pled and the judicially noticeable information in the '379 patent file history that K-C had any intent to deceive the Examiner during prosecution of the '103 Application, let alone conclude that the "single most reasonable inference" to be drawn is that K-C intended to deceive the Examiner. FQ alleges K-C knowingly withheld the 1996 Pull-Ups®, "buried" the summary judgment decision from the '067 patent case, failed to disclose the '067 patent reexamination rejections, and made misleading statements. The fraud theory unravels,

8

however, when one considers that K-C actually provided and the Examiner actually considered the summary judgment decision. FQ acknowledges that K-C submitted the summary judgment decision to the Examiner on November 6, 2012, notwithstanding the Examiner's Notice of Allowance issued October 10, 2012 indicating that the Examiner approved the pending claims and intended to allow the '379 patent to issue. Am. Ccl. ¶ 81. That fact alone "points away from an intent to deceive." *Akron Polymer Container Corp. v. Exxel Container, Inc.*, 148 F.3d 1380, 1384 (Fed. Cir. 1998). Moreover, although FQ alleges K-C "buried" the decision in its submission like a needle in a haystack, the Examiner's notes show she actually considered the decision. On May 6, 2013, the Examiner noted, in writing, "ALL REFERENCES CONSIDERED EXCEPT WHERE LINED THROUGH. /J.S./" and the summary judgment decision was not lined through. ECF No. 241-8 at 54. The Court may take judicial notice of the contents of the '103 Application and its prosecution or file history. *Standard Havens Products, Inc. v. Gencor Industries, Inc.*, 897 F.2d 511, 514 n.3 (Fed. Cir. 1990). And a claim of fraud on the PTO cannot stand where the examiner was provided and actually considered the supposedly "buried" reference. *See Fiskars, Inc. v. Hung Mfg. Co.*, 221 F.3d 1318, 1327 (Fed. Cir. 2000) (citing *Scripps Clinic & Research Found. v. Genentech, Inc.*, 927 F.2d 1565 (Fed. Cir. 1991); *see also Molins*, 48 F.3d at 1184 ("The examiner initialed each reference, indicating his consideration of the same, and stated that he had considered all of the cited prior art. Absent proof to the contrary, we assume that the examiner did consider the references.").

*Molins* teaches that determining whether facts give rise to the inference of deceptive intent must be determined in light of the "realities of patent practice." 48 F.3d at 1184. One of those realities is a great risk of a later accusation of inequitable conduct, and it is precisely for that reason that many practitioners over disclose information to the PTO. *Therasense*, 649 F.3d at 1289–90. To infer bad faith from over disclosure, rather than a good faith effort to avoid an inequitable

9

conduct claim, some otherwise misleading conduct must be alleged. As FQ acknowledges, mere "burying" is not inequitable conduct without some other misdirection. *See Molins*, 48 F.3d at 1184 (discussing *Penn Yan Boats, Inc. v. Sea Lark Boats, Inc.*, 359 F. Supp. 948 (S.D. Fla. 1972)). FQ alleges K-C did misdirect by submitting a Certification Statement with the November 6, 2012 submission that directed the Examiner's attention to irrelevant documents and away from the summary judgment decision. But the Certification Statement is simply not misleading. ECF No. 241-8 at 81. K-C did not suggest in the Certification that the documents referenced were in any way the most relevant, nor was K-C under any obligation to explain the relevance of the documents submitted. *See Molins*, 48 F.3d at 1184 (explaining that PTO rules do not require any explanation of the relevance of information submitted in the English language); 37 C.F.R. § 1.98(a)(2)(i). FQ argues K-C's voluminous submission violated PTO procedures, procedures FQ says "caution" against submissions of long lists of documents and "urge" practitioners to highlight the most significant documents when long lists are submitted, Am. Ccl. ¶ 83, but the Examiner could have refused to consider the long list if it violated PTO procedures. *See Molins*, 48 F.3d at 1184 n.14. In any event, the mere violation of a procedure does not necessarily equate to misleading conduct.

Considering the foregoing, FQ's other allegations—that K-C withheld the 1996 Pull-Ups® and withheld the rejections issued by another PTO Examiner in the '067 patent reexamination proceedings—do not help. The materiality of the 1996 Pull-Ups® is entirely contingent on the belief that the refastenable side seams themselves, the key feature of the invention, were invalid as obvious. The reason FQ brought the 1996 Pull-Ups® to this Court's attention in its motion for summary judgment of invalidity in this case was to show that there was nothing patentably significant about the differences between the invalidated refastenable side seams claimed in the '067 patent and the asserted claims in the '379 patent. In other words, if the Examiner did not believe

10

the refastenable side seams were invalid, which she obviously didn't, there is no reason whatsoever to believe the 1996 Pull-Ups® would have changed her mind.

And while K-C did not disclose the reexamination rejections, it disclosed the existence of the reexamination proceedings. FQ has not cited and the Court is not aware of any authority obligating K-C to supplement its disclosure when the rejections were issued. *Cf. Pixion, Inc. v. Citrix Systems, Inc.*, No. C 09-03496 SI, 2012 WL 762005, at *16–17 (N.D. Cal. March 8, 2012) ("While the Federal Circuit has found rejections of copending applications to be material, it has never found that failure to continuously update an [Information Disclosure Statement] with negative office actions in otherwise disclosed applications evidences a specific intent to deceive. Without more, the initial disclosure of the copending application in the IDS 'points away from an intent to deceive.'" (quoting *Akron*, 148 F.3d at 1384)).

For all of these reasons, FQ's fraud claim must be dismissed.

## III. NEW "SHAM LITIGATION" CLAIMS

K-C also argues FQ's new allegations of sham litigation based on K-C's assertion of the '751 and '119 patents in the 2009 case in this Court constitute compulsory counterclaims under Rule 13(a) that had to be asserted in the 2009 case or forever waived. K-C also argues the claims fail as a matter of law on the merits.

FQ argues these counterclaims had not yet "matured" during the 2009 case, and that even if the claims were compulsory, the new allegations of sham litigation based on the '751 and '119 patents are further support for the pattern claim, which K-C does not argue was compulsory in the underlying case.

Ultimately I do not believe sham claims are necessarily compulsory in the underlying patent litigation. "In order to be a compulsory counterclaim, Rule 13(a) requires that the claim (1) exist

11

at the time of pleading, (2) arise out of the same transaction or occurrence as the opposing party's claim, and (3) not require for adjudication parties over whom the court may not acquire jurisdiction." *Burlington Northern R. Co. v. Strong*, 907 F.2d 707, 710–11 (7th Cir. 1990). A patent infringement claim arises out of the alleged infringement; a sham claim arises out of the filing of the infringement action or, as in the case of the '379 patent, out of the refusal to withdraw the infringement action despite the Federal Circuit's affirmance of the judgment of invalidity of the closely related parent patent. For these reasons, the sham claim will not necessarily exist at the time of the pleading alleging infringement, and it is not clear that infringement and sham claims arise out of the same transaction. Moreover, like requests for sanctions, sham claims should not be asserted haphazardly. A categorical rule that such claims are compulsory during the underlying patent case would only encourage the filing of counterclaims alleging sham litigation.

That being said, I agree with K-C that FQ's claim based on the '119 patent fails to state a claim for sham litigation as a matter of law. FQ alleges K-C knew at the time it sued FQ that the '119 patent was invalid under the "printed matter doctrine," which is what I ultimately concluded in a decision granting FQ's motion for summary judgment. Case No. 09-cv-916, ECF No. 805. But K-C had a good faith argument that an exception to the doctrine applied. *Id.* at 6–11. It follows that K-C's assertion of the '119 patent was not objectively baseless.

FQ's theory that K-C "knew full well" the '119 patent was invalid at the time it was asserted is that the PTO had by that time already applied the printed matter doctrine to another K-C patent application. FQ alleges this other application "included claims to graphics that were very similar to the asserted claims" in the '119 patent. Am. Ccl., ¶ 56. There is no allegation that the '119 patent issued from a continuation of the other application to which the PTO apparently applied the doctrine, however. Indeed, the '119 patent did not issue from a continuation application. Case No.

12

09-cv-916, ECF No. 1-1. Unlike the sham claim based on the '379 patent, then, there is no reason to believe the presumption of validity afforded to patents should not apply to the '119 patent, even if the PTO had applied the printed matter doctrine to some similar claims in an unrelated application, and even if the Court ultimately concluded that the exception to the doctrine did not apply and the patent was invalid. *PRE*, 508 U.S. at 60 n.5 ("[W]hen the antitrust defendant has lost the underlying litigation, a court must resist the understandable temptation to engage in post hoc reasoning by concluding that an ultimately unsuccessful action must have been unreasonable or without foundation." (quotations omitted)).

Likewise, I agree with K-C that FQ's claim based on the '751 patent fails to state a claim for sham litigation as a matter of law. This Court ultimately granted FQ's motion for summary judgment that Claim 4 of the '751 patent was invalid as anticipated by Kling. Case No. 9-cv-916, ECF No. 803 at 10. FQ alleges K-C knew Claim 4 was invalid based on Kling at the time K-C filed suit because the European Patent Office had previously concluded that an identical claim in the international counterpart to the '751 patent was not valid based on Kling. Am. Ccl., ¶ 52. But as FQ admits, K-C submitted Kling to the PTO during prosecution of the '751 patent. *Id.* ¶ 53. FQ alleges K-C "buried" Kling within a long list of other references and never disclosed the EPO's report relying on Kling to the PTO. But K-C was under no obligation to disclose the report, only the actual references, *Manuel of Patent Examining Procedure* § 2001.06(a), and the mere allegation of "burying" without some affirmative misdirection, as noted above, has never sufficed to state a claim of inequitable conduct before the PTO.

FQ also alleges in the amended counterclaims that K-C withheld material information and made material omissions or misrepresentations to the PTO during prosecution of another patent (the '991 patent) and two other applications (the '589 and '463 applications). Am. Ccl. ¶¶ 109–19. FQ

13

does not allege, however, that K-C attempted to enforce or made any threats to enforce the '991 patent, and K-C has not even been issued patents to enforce the '589 and '463 applications. These allegations were included as part of the alleged pattern claim and to bolster the inference of deceptive intent by the attorneys involved in the '103 Application. *See* FQ's Br. in Supp. Mot. for Reconsid. 8, ECF No. 234; Am. Ccl. ¶ 118. None of the allegations independently supports a sham litigation claim, and FQ does not argue otherwise. *See generally* FQ's Br. in Opp. to Mot. to Dismiss, ECF No. 242.

For these reasons, none of FQ's new sham allegations state a claim as a matter of law.

### IV. COUNTERCLAIMS II, III AND IV

K-C moves to dismiss the Wisconsin Antitrust Act claim (Counterclaim II) on the same grounds that it moves to dismiss the analogous Sherman Act claim. K-C's Br. in Supp. at 9 n.5. K-C also moves to dismiss FQ's claim under Wis. Stat. § 100.20 et seq. (Counterclaim III) on the ground that the law cited only provides a private cause of action if a defendant has violated an administrative order issued by the Wisconsin Department of Agriculture, Trade and Consumer Protection. *Id.* at 44–45. Finally, K-C moves to dismiss the claim entitled "Breach of the Duty of Good Faith and Candor to the Patent Office" on the ground that such a claim is effectively a claim that K-C obtained the '379 patent by fraud on the PTO and inequitable conduct, which K-C argues should be dismissed for reasons discussed above. *Id.* at 45. FQ does not substantively respond. FQ's Br. in Opp. 44, ECF No. 242. Counterclaims III and IV are therefore dismissed and Counterclaim II is not dismissed only to the extent Counterclaim I alleging a violation of the Sherman Act is not dismissed. That is, the case will proceed as to Counterclaims I and II as limited to the allegations of sham litigation based on the '379 patent.

## CONCLUSION

For all of these reasons, FQ's motion for reconsideration (ECF No. 233) is denied and K-C's motion to dismiss (ECF No. 240) is granted. Pursuant to the parties' previous stipulation (ECF No. 228), the parties shall meet and confer on a discovery schedule regarding the remaining counterclaims within 20 days of the date of this order. The Clerk of Court is directed to set this matter for a Rule 16 telephone conference to address further scheduling within a reasonable time thereafter. The motions to seal those portions of the parties' filings containing confidential discovery materials (ECF Nos. 231, 239, 245) are granted.

**SO ORDERED** this  30th  day of September, 2016.

 s/ William C. Griesbach
William C. Griesbach, Chief Judge
United States District Court
